# IN THE SUPREME COURT OF IOWA

No. 11–0114

Filed December 9, 2011

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

Complainant,

vs.

**DAVID M. NELSEN,**

Respondent.

On review of the report of the Grievance Commission of the
Supreme Court of Iowa.

An attorney filed a notice of appeal concerning a recommendation
of the Grievance Commission of the Supreme Court of Iowa. **LICENSE
REVOKED.**

Charles L. Harrington and Wendell J. Harms, Des Moines, for
complainant.

David M. Nelsen, Marana, AZ, pro se.

**WIGGINS, Justice.**

In this attorney disciplinary proceeding, the Iowa Supreme Court Attorney Disciplinary Board complains David M. Nelsen, an attorney licensed to practice law in the State of Iowa, violated numerous provisions of the Iowa Code of Professional Responsibility for Lawyers.[1] Nelsen has retired and his license is presently under suspension for his failure to pay fees and comply with the continuing legal education requirements.

The charges against Nelsen stem from Nelsen's representation of Hebel & Son Greenhouse, Inc. (Greenhouse) in 2004. In early 2004, Greenhouse went out of business when it owed the bank roughly $3.6 million. At the time, Greenhouse had over $337,000 in accounts receivable due and owing, and the bank demanded production of accounts receivable checks allegedly received by the corporation and deposited into a secret corporate bank account in Nevada.

The Grievance Commission of the Supreme Court of Iowa found that Nelsen violated numerous provisions of the Iowa Code of Professional Responsibility for Lawyers. Specifically, it found that Nelsen assisted Greenhouse's owners in diverting at least $141,335.34 of Greenhouse's accounts receivable from the control of the court-appointed receiver. The commission recommended that we suspend Nelsen's license for two years.

On our review, we find Nelsen aided and abetted his client in defrauding the bank and the receiver of the accounts receivable. Accordingly, we revoke Nelsen's license to practice law in this state.

---

[1]The Iowa Rules of Professional Conduct replaced the Iowa Code of Professional Responsibility for Lawyers on July 1, 2005. All of Nelsen's alleged violations occurred prior to July 1, 2005. Therefore, the Iowa Code of Professional Responsibility for Lawyers governs Nelsen's conduct.

## I. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton,* 784 N.W.2d 761, 763 (Iowa 2010). The Board must prove an attorney's ethical misconduct by a convincing preponderance of the evidence. *Id.* A convincing preponderance of the evidence is more than the preponderance standard required in the usual civil case, but less than proof beyond a reasonable doubt. *Id.* We respectfully consider, but are not bound by, the commission's findings of fact, conclusions of law, and disciplinary recommendations. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Axt,* 791 N.W.2d 98, 101 (Iowa 2010). Upon proof of misconduct, we may impose a greater or lesser sanction than that recommended by the commission. *Id.*

## II. Background Facts and Proceedings.

On our de novo review, we find the following facts. Robert and Carole Hebel owned Greenhouse, a corporation with facilities in Nora Springs and Mason City. Greenhouse primarily wholesaled flowers and plants to various retail stores, such as Walmart, Sam's Club, and Hy-Vee. Greenhouse obtained construction loans, real estate loans, and operating loans from First Citizens National Bank. To secure payment of these loans, Greenhouse, Robert, and Carole signed and delivered security agreements covering all rights in the future to the payment of money, including payments arising out of accounts receivable.

After Robert was diagnosed with lung cancer, Robert and Carole moved to Nevada in 2001, leaving their son and daughter-in-law, Michael and Kristi Hebel, to run the business. Even though Robert lived in Nevada, both Kristi and Michael considered Robert to be the major day-to-day decision maker on all decisions involving accounts, contracts, and

operations. Greenhouse began to have financial problems after Robert and Carole moved to Nevada. Nelsen acted as Greenhouse's attorney in connection with its financial problems involving First Citizens.

In late 2002, it became apparent to First Citizens that Greenhouse would be unable to pay off its 2001 operating note. First Citizens and Greenhouse entered into a forbearance agreement in March 2003, which allowed Greenhouse to continue operating. Nelsen took part in the negotiation of the forbearance agreement. In September or October, First Citizens realized Greenhouse would not meet its projections. In November, First Citizens notified Greenhouse that it would not advance operating capital for 2004.

In January 2004, Greenhouse owed First Citizens principal of about $3.6 million. On January 7, the bank's attorney, John Duffy, advised Nelsen in a letter that Greenhouse was in default on its March 2003 credit agreement with First Citizens. The letter indicated that First Citizens had made repeated requests for an itemization of Greenhouse's existing accounts receivable and that Greenhouse had not deposited proceeds of its accounts receivable into its account at the bank. Kristi prepared a summary of the outstanding accounts receivable and delivered it to Nelsen. Nelsen delivered the summary to First Citizens. At the time, Greenhouse had outstanding accounts receivable totaling $337,287.31.

Greenhouse ceased operations on January 9, 2004. That same day, Duffy wrote another letter to Nelsen requesting that Greenhouse deliver all existing accounts receivable, vendor agreements, and documents pertinent to an insurance claim to First Citizens. Shortly thereafter, First Citizens had Greenhouse's locks changed.

On January 12, Nelsen wrote a letter to Duffy listing certain requests the Hebels were making of First Citizens during the liquidation of Greenhouse. The letter also listed some of the accounts receivable owed to Greenhouse. Nelsen delivered the letter to the bank that day.

First Citizens delivered a letter in response on January 13. In the letter, First Citizens raised numerous questions regarding its collateral and the conversion of the collateral by Greenhouse.

On January 14, Nelsen responded to First Citizens' letter. In this letter, Nelsen acknowledged that First Citizens was not going to comply with the requests made in his January 12 letter. Because the parties could not reach a resolution, Nelsen wrote, "In fact, after today the money [received by Greenhouse] would have to be deposited in my trust account." First Citizens relied on Nelsen's representation that he would deposit any accounts receivable he received into his trust account until the parties resolved the dispute.

Prior to this dispute, in late 2003 and early 2004, Kristi knew First Citizens expected the accounts receivable to be deposited into Greenhouse's account at First Citizens. Greenhouse's customers paid their invoices by sending checks to a post office box in Nora Springs. Although Kristi and Michael originally leased the post office box for their personal use, they later shared it with Greenhouse. Because the Nora Springs post office did not deliver mail to Greenhouse's physical address, all of Greenhouse's mail had to be retrieved from the post office box.

After Greenhouse closed, its customers continued to mail accounts receivable payments to the post office box. Kristi and Nelsen communicated about how to handle the corporate mail. For two to four weeks after Greenhouse went out of business, Kristi and Michael picked up the mail at the post office box. Kristi separated her personal mail,

Michael's personal mail, and junk mail from the corporate mail. From her experience sorting the mail, Kristi could distinguish Greenhouse's mail from the other mail in the post office box. She did not open Greenhouse's mail. After Greenhouse closed, Kristi did not deliver any corporate mail directly to Robert, Carole, or First Citizens. Instead, Kristi put a rubber band around Greenhouse's mail, which included all accounts receivable payments mailed to the post office box, and delivered Greenhouse's mail to Nelsen.

On January 15, Nelsen wrote Duffy a letter stating that he had personally delivered checks totaling $23,463.77 to First Citizens. Nelsen delivered the checks in open envelopes.

On February 2, First Citizens filed and served Nelsen with a petition to foreclose the security interest, an application to take Kristi's deposition, a request for the production of documents, an order granting the application to take Kristi's deposition and shortening the time period for the production of documents, a subpoena duces tecum commanding Kristi to appear for a deposition and produce the requested documents, and an order appointing the vice president of First Citizens, John Bleakney, as the receiver.

The district court gave Bleakney the right to take control of all accounts receivable and company records. Bleakney also had the duty to see that Greenhouse's nursery products were maintained and subsequently sold and liquidated. The court also required Robert and Carole to furnish Bleakney with documents responsive to the request for production. Nelsen filed an interlocutory appeal with the supreme court on February 12 challenging the order appointing Bleakney as the receiver. First Citizens resisted, and we denied Nelsen's application.

The request for production included requests for invoices, vendor agreements, documents relating to Greenhouse's right to collect insurance proceeds, checks and cash collected by Greenhouse that were not deposited into Greenhouse's account at First Citizens, keys to the offices, insurance policies, computer passwords, and the company's books and records.

After Kristi did not appear for her February 11 deposition because of an illness, First Citizens filed a second application to take Kristi's deposition. The district court granted the application and, once again, ordered Kristi to appear for the deposition and bring documents responsive to the request for production. First Citizens served Nelsen with the second application to take Kristi's deposition, the order granting the second application, and the subpoena demanding that Kristi appear and produce documents.

On February 13, Kristi appeared for her deposition, but she did not bring any documents responsive to the request for production. Kristi testified that she did not have any of the requested documents in her possession and could not access them. Nelsen did not attend the deposition. Instead, Nelsen sent Duffy a letter on the day of Kristi's deposition indicating that Kristi was no longer an officer or employee of Greenhouse and, consequently, that he would not attend Kristi's deposition because she was no longer associated with the corporation. Nelsen also wrote,

> I am not understanding why there was no negotiation by the Bank to get this matter settled without further litigation and expense that will never be recouped by anyone.
>
> On behalf of the Corporation, I believe that Mr. and Mrs. Hebel are still willing to get the matter settled, but it appears the Bank is unwilling. If that is incorrect, please do not hesitate to contact me, but with the realization I will be gone

until March 1st. Unfortunately, I have had to delay that trip for several days but will no longer continue to delay it.

On February 18, First Citizens filed a motion to compel because it still had not received documents or checks. First Citizens also filed a petition in replevin to recover and take possession of Greenhouse's tangible equipment. Finally, First Citizens filed a petition for foreclosure against Greenhouse. The district court set a hearing on the motion and both petitions for March 2. First Citizens served Nelsen with the motion and both petitions.

On March 2, the day of the hearing, Nelsen filed a resistance to the motion to compel. Nonetheless, the court granted the motion and ordered Greenhouse, Robert, and Carole to respond to the document production request within ten days.

On March 15, Bleakney and Duffy met with Nelsen at Nelsen's office to review Greenhouse's records. Nelsen delivered fourteen accounts receivable checks, out of their envelopes, roughly totaling $3,962. Nelsen did not produce accounts receivable or accounts payable invoices at the meeting. Nelsen told Bleakney and Duffy that Kristi and Michael brought him the corporate mail, including checks, proofs of delivery, and other communications relative to the invoices. Nelsen also informed them that he, in turn, forwarded the mail and checks to Robert and Carole in Nevada.

After this meeting, Bleakney learned that Robert had opened a Greenhouse checking account at U.S. Bank in Nevada. Robert acknowledged he could have opened this account. During late February 2004, Robert and Carole deposited funds received from Nelsen into this account totaling $143,587.26. They made the deposits as follows: $28,795.93 on February 17, $49,028.69 on February 18, $62,392.28 on

February 19, and $3,370.36 on February 20. Robert acknowledged that an endorsement on one of the accounts receivable checks looked like his signature. One additional deposit totaling $898.57 was made on March 1. During the rest of March, fifty-three more checks totaling $129,025.53 were deposited into Greenhouse's account at U.S. Bank in Nevada. First Citizens did not receive any of these funds.

On February 28, Robert wrote a check to Nelsen for $9,505.50 for his services drawn from the Greenhouse account in Nevada. Neither Bleakney nor the district court authorized the payment. The check cleared the Greenhouse account on March 15, the same day Nelsen met with Bleakney and Duffy.

On March 24, First Citizens filed a motion of receiver in accordance with Iowa Code section 680.10 (2003) to allow Bleakney to collect Greenhouse's assets. First Citizens wanted the district court to order Robert and Carole to appear for an examination and bring the missing accounts receivable. The court scheduled a hearing for April 2. Nelsen filed a motion to continue the hearing because he had been out of Iowa and did not have time to prepare. The court continued the hearing to April 16.

At the time, First Citizens was concerned about the discovery process because it still did not have the accounts receivable or the invoices and felt it was not getting any response. In spite of those facts, First Citizens continued to grow plants using Greenhouse's facilities, persisted in identifying buyers for Greenhouse's equipment, and conducted environmental studies on the real estate.

On April 1, First Citizens filed a motion for sanctions pursuant to Iowa Rule of Civil Procedure 1.517. Specifically, First Citizens sought sanctions against Greenhouse, Carole, Robert, and Nelsen. The motion

stated the documents produced in response to the bank's request for production did not include invoices or proceeds, except for checks roughly totaling $3,962. It further stated a company account was opened at U.S. Bank in Nevada into which company proceeds were deposited. It also alleged Nelsen transmitted invoices and proceeds through his office to Carole and Robert. Finally, the motion stated Carole, Robert, and Nelsen failed to produce all books and records on a continuing basis, as required by the district court.

The district court scheduled a hearing on the motion for April 16. Nelsen appeared at the hearing on behalf of Robert, Carole, and Greenhouse. The district court ordered Robert, Carole, and Michael to appear in Iowa and submit to examinations. The order stated the district court would hold another hearing on April 20 if the parties could not agree on a time and place for the examinations.

On April 19, Duffy sent Nelsen a letter as "the good faith effort of First Citizens . . . to resolve the discovery issues raised in the motion for sanctions." The letter asked Nelsen to file responsive pleadings in the three cases pending against Greenhouse and its owners. It also repeated the request for the production of documents, asked to take depositions, and stated, "The cooperation of the Defendants will be appreciated." Specifically, First Citizens sought responsive pleadings to the petition to foreclose the security interest, the replevin petition, and the foreclosure petition. Nelsen did not respond to Duffy's letter.

On April 20, the district court held a hearing attended by Bleakney, Duffy, and Nelsen to force the parties to agree on dates for the depositions of Robert and Carole. The court ordered Robert and Carole to appear personally at Cerro Gordo County Courthouse on May 7. Sometime between the hearing and May 7, Nelsen told Duffy that he did

not think Robert and Carole would appear. Neither Robert nor Carole appeared on May 7 for their depositions.

In the month of April, five more checks totaling $1,420.46 were deposited into the Greenhouse bank account in Nevada. First Citizens did not receive these funds.

After Robert and Carole did not appear on May 7, First Citizens filed a second motion, requesting that Nelsen submit to a deposition. It also filed an amendment to the petition to foreclose the security interest to attach the U.S. Bank account in Nevada. The district court ordered the attachment of the U.S. Bank account and ordered Nelsen to appear on May 17.

On May 17, Duffy took Nelsen's deposition. Nelsen asserted that the attorney-client privilege and work-product doctrine prevented him from disclosing whether he possessed Greenhouse proceeds or whether he knew of the existence of the Greenhouse invoices. Nelsen refused to state whether Kristi, Michael, or anyone else had delivered Greenhouse checks to him. He also asserted that, while he forwarded mail to Robert and Carole in Nevada, either the work-product doctrine or the attorney-client privilege prevented him from identifying the contents of the mail. Nelsen also indicated that he was no longer Greenhouse's attorney, which explained why he did not file answers in any of the three litigation matters proceeding against Greenhouse. However, Nelsen did not file a motion to withdraw in any of the three lawsuits. The district court entered default judgments against Greenhouse, Robert, and Carole in all three lawsuits.

In the month of May, a check in the amount of $13,977.49 cleared Greenhouse's U.S. Bank account. First Citizens did not receive these funds either.

### III. Violations.

We can take disciplinary action against an attorney even if the attorney is not actively engaged in the practice of law. *Templeton*, 784 N.W.2d at 767. We can also take action against an attorney whose license is under suspension for a reason unrelated to the present disciplinary proceeding. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 595 (Iowa 2011). Thus, even though Nelsen is now retired and his license is under suspension, we still have the authority to sanction him upon a finding that he engaged in a separate violation of the Iowa Code of Professional Responsibility for Lawyers.

We agree with the commission's finding that Nelsen assisted Robert and Carole in diverting at least $141,335.34 of Greenhouse's accounts receivable from the control of the receiver. We also find that Nelsen knowingly approved and agreed to Robert and Carole's conversion of the bank's funds by actively participating in the conversion.

We reach this conclusion for a number of reasons. First, Nelsen knew of First Citizens' security interest in the accounts receivable and that Greenhouse normally deposited accounts receivable checks into an account at First Citizens. After Greenhouse stopped doing business, Nelsen and Kristi discussed how she should handle Greenhouse's mail. They determined that Kristi should pick up the mail and bring it to Nelsen's office. Nelsen knew there were checks in the mail because he delivered open envelopes containing checks and checks without envelopes to First Citizens.

Second, Nelsen knew that a dispute existed between his clients and First Citizens. In his letter dated January 14, 2004, Nelsen acknowledged the dispute and represented to First Citizens that he would have to deposit any checks he received into his trust account until

the dispute was resolved. First Citizens relied upon Nelsen's representation that he would deposit any checks he received into his trust account pending a resolution of the dispute. In spite of this representation, Nelsen delivered some of the checks to the bank while mailing most of the checks to Robert and Carole in Nevada. When First Citizens discovered Nelsen was not depositing the disputed accounts receivable checks into his trust account, it filed three court actions, one of which was to appoint a receiver to handle the disputed accounts receivable. Even after the appointment of the receiver, Nelsen continued to send checks to Robert and Carole in Nevada.

Finally, Nelsen knew Robert and Carole were depositing the money into a bank account in Nevada, not applying it to the debt at First Citizens, and converting it to their own use. One indication that Nelsen had knowledge of the conversion is that he was a beneficiary of the conversion when he received a check from the Nevada account covering his attorney fees.

Although an attorney has a duty to represent his or her client zealously, the attorney must do so within the bounds of the law. Iowa Code of Prof'l Responsibility Canon 7. In doing so, Nelsen could have used any legitimate means to protect his clients' rights. *See id.* DR 7–102(A)(2). However, in the representation of a client an attorney cannot "[k]nowingly make a false statement of . . . fact" or "[c]ounsel or assist a client in conduct that the lawyer knows to be illegal or fraudulent." *Id.* DR 7–102(A)(5), (7).

Nelsen misrepresented a fact to First Citizens when he said he would deposit the disputed funds into his trust account, knowing that he had sent the received checks to Robert and Carole in Nevada and that he would continue to do so with checks received in the future. Nelsen sent

the majority of the accounts receivable checks to Nevada. In addition, by delivering some of the checks to First Citizens, he led the bank to believe he was safeguarding the bank's security interest. We find that, through his conduct, Nelsen knowingly assisted his clients in defrauding the bank. We also find that this conduct violates DR 7–102(A)(5) and (7).

We also agree with the commission that Nelsen's acts violated other provisions of the Iowa Code of Professional Responsibility for Lawyers. However, we need only to address Nelsen's role in aiding and abetting his clients in converting First Citizens' funds to determine the appropriate sanction.

## IV. Sanction.

It is almost axiomatic that we will revoke the license of an attorney who converts a client's funds to his or her own use. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 309 (Iowa 2009); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson*, 687 N.W.2d 587, 590 (Iowa 2004); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Williams*, 675 N.W.2d 530, 533 (Iowa 2004). The same is true where an attorney misappropriates the funds of a non-client for his or her personal use. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Polsley*, 796 N.W.2d 881, 886 (Iowa 2011); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carroll*, 721 N.W.2d 788, 792 (Iowa 2006); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 655 (Iowa 2002).

We have also held that we can discipline an attorney for aiding and abetting a client to commit a crime. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Gailey*, 790 N.W.2d 801, 807 (Iowa 2010). Further, we have revoked the license of an attorney who was convicted of aiding and abetting the conversion of social security benefit payments. *Polsley*, 796 N.W.2d at 883, 886. We are unable to find an Iowa case that requires us

to revoke an attorney's license when the attorney aids and abets a client in converting the funds of others, but who is not convicted of the criminal act. However, we have disciplined an attorney where we found evidence sufficient to establish the commission of a crime even though the attorney was not charged with or convicted of the crime. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lustgraaf*, 792 N.W.2d 295, 299, 302 (Iowa 2010). Thus, we must decide whether revocation is the proper sanction when an attorney aids and abets a client in converting funds, without receiving any personal gain from those funds, and he is not charged with or convicted of a crime.

We start with the long-standing policy of this state regarding attorneys who convert the funds of others. We have said,

> [W]e have previously indicated conversion of client funds by lawyers will not be tolerated. *We have also emphasized our obligation to protect the public from theft and deceit.* The public, as well as the bar, needs to know disbarment will nearly always follow such wrongdoing.

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Carr*, 588 N.W.2d 127, 129 (Iowa 1999) (emphasis added) (citations omitted).

This policy makes it clear that it is almost certain that we will revoke the license of any attorney involved in the conversion of funds. Although Nelsen did not receive a personal gain other than his legal fees, he knowingly and willfully participated in his client's scheme to defraud First Citizens when his clients converted the funds owed to the bank. Nelsen's clients were able to convert the bank's funds because Nelsen knowingly made false representations to First Citizens that he would protect the accounts receivable by depositing them into his trust account until the parties resolved the legal dispute. Nelsen strung First Citizens along by delivering some of the checks to First Citizens, while at the

same time sending the majority of the checks to his clients in Nevada. Nelsen allowed the conversion of funds to take place over an extended period of time by not responding diligently to the legal actions filed by First Citizens. Finally, when the court appointed a receiver, Nelsen continued to send checks to his clients in Nevada in contravention of court orders.

Given Nelsen's aiding and abetting in the conversion of First Citizens' funds, and the seriousness of the ethical violations as established by the evidence, we can only reach one conclusion—the appropriate sanction is revocation of Nelsen's license to practice law.[2]

## V. Disposition.

For all of the reasons stated in this opinion, the license of the respondent, David M. Nelsen, is revoked effective with the filing of this opinion. We assess the costs to the respondent as provided in Iowa Court Rule 35.26(1).

**LICENSE REVOKED.**

---

[2]Other states have not hesitated to revoke the license of an attorney who has been convicted of aiding and abetting a fraud or theft. *See, e.g., In re Smith*, 794 P.2d 601 (Ariz. 1990); *Cambiano v. Ligon*, 44 S.W.3d 719 (Ark. 2001); *In re Severo*, 714 P.2d 1244 (Cal. 1986); *In re DeRose*, 55 P.3d 126 (Colo. 2002); *People v. Bruun*, 764 P.2d 1165 (Colo. 1988); *In re Wilson*, 740 A.2d 37 (D.C. 1999); *In re Moore*, 686 So. 2d 816 (La. 1997); *In re King*, 646 So. 2d 326 (La. 1994); *Bar Ass'n of Baltimore City v. Snyder*, 331 A.2d 47 (Md. 1975); *In re Keller*, 135 A.2d 321 (N.J. 1957); *In re Young*, 866 N.Y.S.2d 350 (N.Y. App. Div. 2008); *Office of Disciplinary Counsel v. Bertram*, 707 N.E.2d 464 (Ohio 1999); *State ex rel. Okla. Bar Ass'n v. Crabtree*, 907 P.2d 1045 (Okla. 1995).