*516 MANSFIELD, Justice.
An Iowa attorney helped facilitate a fraudulent real estate transaction in which the sales price was overstated by $55,000. The attorney subsequently pled guilty to misprision of a felony, see 18 U.S.C. § 4 (2006), and received probation. We are now asked to decide what ethical rules he violated and what the consequences should be.
This case comes before us on the report of a division of the Grievance Commission of the Supreme Court of Iowa (commission). See Iowa Ct. R. 35.10(1) (2009).[1] The Iowa Supreme Court Attorney Disciplinary Board (Board) alleged the respondent, Paul J. Bieber, violated several rules of professional conduct. The commission agreed and accordingly found that Bieber violated Iowa Rules of Professional Conduct 82:1.2(d), 32.1.16(a)(1), 32:4.1(a), 32:4.1(b), and 32:8.4(b). Additionally, the commission found that Bieber’s felony conviction met the requirements for revocation or suspension under Iowa Code section 602.10122 (2011).
The commission recommended an indefinite suspension from the practice of law with no possibility of reinstatement for six months. Upon our consideration of the commission’s findings of fact, conclusions of law, and recommendations, and our de novo review of the record, we agree Bieber has committed all the violations found by the commission. We also agree with the recommended sanction and order Bieber’s license suspended indefinitely with no possibility of reinstatement for six months.
I. Factual and Procedural Background.
Bieber was admitted to practice law in Iowa in 1980. At all relevant times in this proceeding, he has resided and maintained his law office in Scott County. Bieber’s law practice includes divorce, personal injury, probate, and some real estate work. Bieber has no history of disciplinary violations. Bieber has a distinguished record of community involvement including service with the Davenport Historic Preservation Commission, the Salvation Army, Neighborhood Housing Services, and “In From the Cold,” an organization that assists the homeless. Bieber also has been president of an inn of court and president of the board of a Catholic school.
On June 30, 2011, Bieber appeared in the United States District Court for the Southern District of Iowa and, under a plea agreement, pled guilty to misprision of a felony.[2] As agreed upon by Bieber and the federal government, Bieber was sentenced to three years of probation, which was within the federal sentencing guidelines. Bieber also was ordered to pay restitution to the lender in the amount of $37,969.99.
The facts of this transaction are set forth in the plea agreement:
Mary Pat Lord, a real estate agent, had a listing for the sale of 1818 Esplanade Avenue, Davenport, Iowa, then owned by Denisa Woods. Lord arranged to sell the property to Darryl Hanneken and Robert Herdrich for the price of *517 $100,000. Lord and the parties agreed that the HUD-1 Settlement Statement and other documents pertaining to the sale would reflect a price of $155,000, thereby allowing Hanneken and Herd-rich to obtain a mortgage loan for $108,500, greater than the actual sale price. Further, Lord and the parties agreed that after proceeds of the sale had been paid to Woods, she would convey a $55,000 “cash back” payment (the difference between the actual price and inflated sale price) to Hanneken and Herdrich. The actual price and the existence of the cash back payment to Hanneken and Herdrich would be concealed from the mortgage lender, Inter-bay Funding, by omitting those details from the HUD-1 Settlement Statement. Woods lived outside the Davenport area, so [Bieber], an attorney, was retained to act for Woods in connection with the sale and closing pursuant to a power of attorney. [Bieber] was aware of the lower actual price and the cash back payment, and the fact that those details would not be conveyed to the lender on the HUD-1 Settlement Statement. [Bieber] did an affirmative act to conceal the offense, in that [Bieber] provided via the closing process information that falsely represented that the higher inflated price was the agreed price and failed to reveal the lower actual price and cash back payment. [Bieber] knew this information would be included on the HUD-1 Settlement Statement. [Bieber] also completed a declaration of value form that falsely represented the sale price.
On or about December 9, 2005, [Bieber] represented Woods at the closing for the sale of 1818 Esplanade and took custody of the proceeds of the sale on behalf of Woods. Thereafter, [Bieber] conveyed the $55,000 cash back payment to Han-neken.
[[Image here]]
In connection with this transaction, [Bie-ber] did not collect any fees or payments except for his $400 fee for representing Woods, which was duly reflected on the HUD-1 form. [Bieber] acted in the interests of Woods in that he carried out her instructions to conduct the transaction.
On May 18, 2011, the Board filed an amended complaint alleging Bieber violated Iowa Rules of Professional Conduct 32:1.2(d), 32:1.16(a)(l), 32:4.1(a), 32:4.1(b), and 32:8.4(b). The Board also alleged that Bieber’s felony conviction met the requirements for revocation or suspension under Iowa Code section 602.10122.
Bieber filed an amended answer admitting most of the allegations in the amended complaint. However, he specifically denied knowing that preparing the HUD-1 document with the inflated sale price amounted to criminal conduct. Additionally, while admitting that he knew the inflated sale price was false, Bieber denied that he had any knowledge the false statement was “material” to the lender.
A one-day hearing before the commission took place on June 6, 2012. Bieber conceded all of the violations charged by the Board except the alleged violations of rule 32:4.1 subparts (a) and (b).[3] He also acknowledged that his guilty plea had pre-clusive effect as to the elements of the crime he had admitted to. See Emp’rs *518 Mut. Cas. Co. v. Van Haaften, 815 N.W.2d 17, 23 (Iowa 2012) (noting the well-established rule that a guilty plea in an Iowa state court “ ‘precludes a criminal defendant from relitigating essential elements of the criminal offense in a later civil case arising out of the same transaction or incident’ ” (quoting Dettmann v. Kruckenberg, 613 N.W.2d 238, 244 (Iowa 2000))).
However, Bieber asserted that both he and his client Woods believed the $55,000 rebate would actually go toward needed repairs and improvements to the property. By their account, which no one disputed, Bieber and Woods were unaware the buyers intended simply to pocket the difference between the $108,500 they had borrowed and the $100,000 net they had transferred to Woods. Bieber also testified that he had repaid the $37,969.99 restitution ordered by the federal court.[4]
The Board proposed a six-month suspension of Bieber’s law license; Bieber conceded a suspension was appropriate but argued for sixty days. After thoroughly discussing the relevant facts and law, the commission recommended that Bieber’s license be suspended indefinitely with no possibility of reinstatement for six months.
II. Scope of Review.
Our review of attorney disciplinary proceedings is de novo. Iowa Ct. R. 35.10(1); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Fields, 790 N.W.2d 791, 793 (Iowa 2010). We give respectful consideration to the commission’s findings and recommendations but are not bound by them. Iowa Supreme Ct. Att’y Disciplinary Bd. v. Lickiss, 786 N.W.2d 860, 864 (Iowa 2010). The burden is on the Board to prove attorney misconduct by a convincing preponderance of the evidence. Id. “This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case.” Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett, 674 N.W.2d 139, 142 (Iowa 2004). It is also a less stringent burden than clear and convincing evidence which is “the highest civil law standard of proof.” Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ronwin, 557 N.W.2d 515, 517 (Iowa 1996). If a violation is established, we “may impose a lesser or greater sanction than recommended by the commission.” Iowa Supreme Ct. Att’y Disciplinary Bd. v. Murphy, 800 N.W.2d 37, 42 (Iowa 2011); see also Iowa Ct. R. 35.10(1).
III. Review of Alleged Ethical Violations.
The Board alleged, and the commission found, that Bieber violated five separate provisions of the Iowa Rules of Professional Conduct. Upon our review, we agree with those findings.
A. Rule 32:1.2(d). Rule 32:1.2(d) forbids a lawyer from “eounsel[ing] a client to engage, or assisting] a client, in conduct that the lawyer knows is criminal or fraudulent.” Iowa R. Profl Conduct 32:1.2(d). Comment 9 to rule 32:1.2 explains that “[paragraph (d) prohibits a lawyer from knowingly counseling or assisting a client to commit a crime or fraud.” Id. r. 32:1.2(d) cmt. 9. Comment 10 explains that a lawyer in a situation such as Bieber’s “is required to avoid assisting the client ... by drafting or delivering documents that the lawyer knows are fraudulent.” Id. r. 32:1.2(d) cmt. 10.
Rule 32:1.2(d) took effect on July 1, 2005, and since that time we have not *519 applied it in any disciplinary opinions. However, the language of rule 32:1.2(d) is substantially similar to our prior disciplinary rule DR 7-102(A)(7), which stated in part, “In the representation of a client, a lawyer shall not ... [cjounsel or assist a client in conduct that the lawyer knows to be illegal or fraudulent.” We find cases interpreting prior disciplinary rule DR 7-102(A)(7) to be instructive in this matter. See Iowa Supreme Ct. Att’y Disciplinary Bd. v. Gailey, 790 N.W.2d 801, 806 (Iowa 2010) (relying on cases applying prior disciplinary rule DR 7-104(A)(l) in interpreting its successor, rule S2:4.2(a)).
For example, in Iowa Supreme Court Attorney Disciplinary Board v. Nelsen, the respondent represented a failed business that owed $3.6 million to a bank. 807 N.W.2d 259, 261 (Iowa 2011). Nelsen misrepresented to the bank that he would deposit the business’s accounts receivable checks into his trust account. Id. at 266. Instead, Nelsen contravened a court order by sending most of these checks to his clients out of state. Id. Ultimately, Nelsen assisted his clients in diverting at least $141,335.34 in accounts receivable from the control of the court-appointed receiver. Id. at 265. Nelsen did not receive any personal benefit from the funds and was not charged with any crimes. Id. at 267. We nonetheless found that his conduct violated DR 7-102(A)(7) and amounted to “knowingly assisting] his clients in defrauding the bank.” Id. at 266.
Bieber does not contest that he violated rule 32:1.2(d). Bieber knew the actual sales price was only $100,000 but was being reported as $155,000. He also knew that the buyers were receiving a $108,500 loan based on the overstated price. He assisted his client in concealing the actual sales price from the lender by processing a HUD-1 Settlement Statement, preparing and executing an Iowa Declaration of Value form, and faxing closing figures to the title company in Illinois, all of which reflected the inflated sales price. At the closing, Bieber took possession of the sale proceeds and issued the $55,000 refund to the buyers from his trust account. Under these facts, we find that Bieber knowingly assisted his client in defrauding the buyer’s lender, Interbay Funding. Thus, Bieber violated Rule 32:1.2(d). See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Romeo, 554 N.W.2d 552, 553-55 (Iowa 1996) (suspending an attorney for three years who assisted a client under criminal investigation by making false receipts “to get the heat off of his client,” and cover up his client’s role as a “fence”).
B. Rule 32:4.1. Rule 32:4.1(a) states “a lawyer shall not knowingly ... make a false statement of material fact or law to a third person.” Iowa R. Profl Conduct 32:4.1(a). Rule 32:4.1(b) provides, “In the course of representing a client, a lawyer shall not knowingly ... fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by rule 32:1.6.” Id. r. 32:4.1(b). The commission found that Bieber violated both subparts (a) and (b) of rule 32:4.1.
Bieber disputes that his conduct violated these rules. At the hearing, Bieber admitted he knew the sale price was inflated, but denied that he had any knowledge the false statement was “material” to the lender, Interbay Funding. Bieber contended that because Interbay Funding was making “liar loans” that did not require income verification, the actual sales price was not material to it.
We are not persuaded. The issue here is not whether the buyers had provided verification of income, but whether the actual sales price of the property mat *520 tered. Those are two different things.[5] Because of the fraud, Interbay Funding wound up lending the buyers $108,500, which was $8500 more than they were really paying for the property. Logic dictates that the overstatement was material; otherwise, the parties would not have engaged in their elaborate charade but would have simply told the bank this was a $100,000 transaction. In the absence of some specific evidence that the actual sales price would not have mattered to this lender, we find the inference of materiality to be established here.
Bieber knowingly processed sales paperwork with an inflated purchase price, faxed the inflated closing figures on his client’s transaction to the title company in Illinois, and completed a declaration of value form that falsely represented the sale price. Bieber’s misrepresentation of the sales price in the transaction constituted a false statement of material fact. See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gallner, 621 N.W.2d 183, 187 (Iowa 2001) (finding that an attorney who enabled clients to receive increased social security disability benefits by exaggerating attorney’s fees in reports to Social Security Administration knowingly made false statements of fact). At no point did he make any attempt to disclose the misrepresentations contained in the sales paperwork. We agree with the commission that this conduct violated both subsections of rule 32:4.1.
C. Rule 32:8.4(b). Rule 32:8.4(b) makes it “professional misconduct for a lawyer to ... commit a criminal act that reflects adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer in other respects.” Iowa R. Profl Conduct 32:8.4(b).
[I]n order for a criminal act to constitute a violation of rule 32:8.4(b),
“ ‘[t]here must be some rational connection other than the criminality of the act between the conduct and the actor’s fitness to practice law. Pertinent considerations include the lawyer’s mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct.’ ”
Iowa Supreme Ct. Att’y Disciplinary Bd. v. Weaver, 812 N.W.2d 4, 11 (Iowa 2012) (quoting Iowa Supreme Ct. Att’y Disciplinary Bd. v. Templeton, 784 N.W.2d 761, 767 (Iowa 2010)).
Bieber acknowledged violating this rule, and the commission so found. We have no difficulty reaching the same conclusion. See Iowa Supreme Ct. Att’y Disciplinary Bd. v. Schall, 814 N.W.2d 210, 212-13 (Iowa 2012) (finding an attorney who pled guilty to three aggravated misdemeanor counts of fraudulent practice in the third degree for failure to timely file tax returns had violated rule 32:8.4(b)). In this case, there was more than a “rational connection” between Bieber’s conduct and his fitness to practice law. See Templeton, 784 N.W.2d at 767. The criminal behavior actually involved actions undertaken by Bieber in his capacity as Woods’s attorney.
As part of the factual basis for the guilty plea, Bieber admitted that he
did an affirmative act to conceal the offense, in that [he] provided via the closing process information that falsely represented that the higher inflated price was the agreed price and failed to *521 reveal the lower actual price and cash back payment.... [Bieber] also completed a declaration of value form that falsely represented the sale price.
This admission demonstrates that Bieber had a culpable mental state. See Templeton, 784 N.W.2d at 767. Interbay Funding was victimized and substantially harmed by Bieber’s misconduct. See id. This is evidenced by the plea agreement ordering him to make restitution in the amount of $37,969.99 to Bayview Loan Servicing, the successor company to Interbay.
Again, the conduct that provided the factual basis for Bieber’s guilty plea related directly to his representation of Woods in the real estate transaction. Bieber’s knowing preparation, processing, and transmission of real estate sale documents containing an affirmative material misrepresentation bear directly on his honesty, trustworthiness, and fitness as a lawyer. Thus, we find Bieber’s felony conviction constitutes misconduct under rule 32:8.4(b).
D. Rule 32:1.16(a)(l). Rule 32:1.16(a)(l) states, “[A] lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if ... the representation will result in violation of the Iowa Rules of Professional Conduct or other law.” Iowa R. Profl Conduct 32:1.16(a)(l). Bieber conceded that his conduct violated rule 32:1.16(a)(l), and we agree.
As discussed above, Bieber knew that his representation of Woods in her real estate transaction would result in the perpetration of a fraud on a lender. Thus, he knew that such representation would cause him to violate rules 32:1.2(d) and 32:4.1(a)-(b). Nonetheless, Bieber continued to represent Woods and made no attempt to withdraw. Accordingly, we find Bieber violated rule 32:1.16(a)(l). See Iowa Supreme Ct. Att’y Disciplinary Bd. v. Dunahoo, 799 N.W.2d 524, 531 (Iowa 2011) (finding an attorney in violation where he failed to “limit his scope of representation to matters in which he could ethically represent” his client).
As Bieber acknowledged at the hearing (with commendable candor):
Q .... Could these two gentlemen, I refer to loosely, Herdrich and Hanneken, have done this without attorneys like you at the time not doing your job? A. No, they couldn’t have. I mean, it’s one of those things that, you know, as we were going through the trial, that occurred to me, that their successful completion of their plan required the participation of somebody such as myself.
Q. Are you proud of that? A. No, I should have known better than that. I mean, that’s the thing about it is, you know, I had the responsibility that I should have figured out what was going on and I didn’t.
Q. Does that bother you? A. Yeah, it does. I mean, like I said, it’s one of those things that, as we were going through it, it was definitely clear to me that, you know, there were multiple players that were required to make their plan work. And, you know, I was one of those players. And if it — I mean, if somebody hadn’t done the part of it that I did, they wouldn’t have been able to pull it off.
IV. Consideration of Appropriate Sanction.
We now consider the appropriate sanction for Bieber’s violation of our disciplinary rules. “We craft appropriate sanctions based upon each case’s unique circumstances, although prior cases are instructive.” Iowa Supreme Ct. Att’y Disci *522 plinary Bd. v. Kallsen, 814 N.W.2d 233, 239 (Iowa 2012).
We have repeatedly held that the goal of our ethical rales is to maintain public confidence in the legal profession as well as to provide a policing mechanism for poor lawyering. Important considerations include the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer’s fitness to practice, and our duty to uphold the integrity of the profession in the eyes of the public. In fashioning the appropriate sanction, we look to prior similar cases while remaining cognizant of their limited usefulness due to the variations in their facts. Often, the distinction between the punishment imposed depends upon the existence of multiple instances of neglect, past disciplinary problems, and other companion violations, including uncoop-erativeness in the disciplinary investigation. Aggravating and mitigating circumstances are also important.
Iowa Supreme Ct. Att’y Disciplinary Bd. v. Humphrey, 812 N.W.2d 659, 666 (Iowa 2012) (citations and internal quotation marks omitted).
“A felony conviction is grounds for revocation or suspension of an attorney’s license to practice law.” See Weaver, 812 N.W.2d at 13 (citing Iowa Code § 602.10122(1)). “The record of conviction is conclusive evidence.” Iowa Code § 602.10122(1).[6]
The commission recommended a six-month suspension, noting we have “consistently imposed harsh sanctions for lawyer’s commission of criminal conduct involving fraud and dishonesty.” The commission found Bieber’s lack of a prior disciplinary record, status as a respected lawyer, and cooperation with the Board in the proceedings to be mitigating factors. The commission also noted that Bieber did not seek or receive additional profit from the transaction, did not devise or manage the fraudulent scheme, promptly reported his conviction to the Board, and appeared sincerely remorseful. As aggravating factors, the commission considered that Bieber “represented other sellers in similar transactions” and, during the hearing, Bieber “suggested that he honestly believed there was nothing wrong with using an inflated price on closing documents to allow a buyer to get money back to make repairs.”[7] Bie-ber also presented evidence at the hearing that he has recently been treated for kidney cancer.
All of the violations in this case stem from Bieber’s representation of Woods in *523 the 2005 real estate transaction and his subsequent felony conviction for misprision of a felony in federal court. Bieber’s misconduct involves an element of deceit. We have repeatedly held that:
[fundamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth.
Kallsen, 814 N.W.2d at 239 (citation and internal quotation marks omitted). Although we do not have any cases where we sanctioned an attorney for misconduct identical to Bieber’s, we do find the following authorities to be instructive.
In the Nelsen case, discussed above, we revoked the attorney’s license for aiding and abetting his clients in converting funds even though the attorney had not received any personal gain from those funds. 807 N.W.2d at 267-68. However, in that case the attorney was involved in a theft: He knowingly redirected $141,335.34 in accounts receivable that belonged to a third-party secured creditor to his clients. Id. at 261, 267. Our decision cited “the longstanding policy of this state regarding attorneys who convert the funds of others.” Id. at 267. As we explained, “This policy makes it clear that it is almost certain that we will revoke the license of any attorney involved in the conversion of funds.” Id.
We think that conduct was more egregious than the conduct here. In Nelsen, the attorney knew his clients were stealing money and helped them do it. In this case, there is no evidence that Bieber knew the buyers were walking away with someone else’s money. The record shows at most that Bieber enabled a lender to be defrauded into lending more than it would otherwise have been willing to lend. Nelsen’s case also demonstrated callous disregard for court orders and resulted in significantly greater financial harm than the case at hand. Id. at 267.
Iowa Supreme Court Attorney Disciplinary Board v. Polsley, like Nelsen, involved theft of property. 796 N.W.2d 881 (Iowa 2011). The respondents in Polsley were husband and wife attorneys. Id. at 882. The wife had been appointed trustee of her dying mother’s trust account which then received social security survivor benefits. Id. at 882. After the mother died, the Social Security Administration mistakenly continued to deposit payments into the account, and the couple converted these funds for their own use. Id. Consequently, both Polsleys ended up pleading guilty in federal court to “knowingly and willfully converting] government property.” Id. at 884. We revoked both of their licenses. Id. at 886.
We think Polsley is distinguishable for largely the same reason as Nelsen. Bie-ber did not convert funds himself or knowingly assist a client in doing so. Rather, he made a misrepresentation in the real estate sales paperwork that fraudulently induced Interbay Funding to enter into a loan agreement with the buyers. While this conduct is reprehensible, we do not think it is the same as outright theft of another person’s money.
In Iowa Supreme Court Attorney Disciplinary Board v. Carroll, we also revoked an attorney’s license. 721 N.W.2d 788, 789 (Iowa 2006). There the attorney, as chairperson of a nonprofit organization, had misappropriated funds for personal use and eventually pled guilty to second-degree theft. Id. at 789-90.
In Iowa Supreme Court Board of Professional Ethics & Conduct v. Williams, we revoked the license of an attorney who *524 pled guilty to “interstate transportation of stolen property and wire fraud.” 675 N.W.2d 530, 531 (Iowa 2004). The convictions were based on the attorney’s embezzlement from two different companies that employed her. Id. at 531-32. As a head of the claims department of a trucking company, she fraudulently obtained $692,540.22 by “submitting fictitious accident claims to her employer” and diverting the checks to her personal bank account. Id. at 531. She also defrauded an insurance company that employed her of $386,713.78 by authorizing the payment of claims to a fictitious claimant which was one of her several aliases. Id. at 532.
Again, we find these theft and conversion cases distinguishable from the present case where the attorney received his normal closing fee to knowingly abet a fraudulent transaction but was not aware that funds were being converted. Our cases are legion that thefts of funds, particularly when the attorney has been criminally convicted for the underlying conduct, will normally result in revocation. See Iowa Supreme Ct. Att’y Disciplinary Bd. v. Wengert, 790 N.W.2d 94, 103-04 (Iowa 2010) (revoking law license for two instances of misappropriating client funds); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Earley, 774 N.W.2d 301, 308-09 (Iowa 2009) (revoking license for misappropriating client funds); Williams, 675 N.W.2d 530, 532-33 (Iowa 2004) (revoking the license of an attorney who defrauded two separate employers in excess of $1 million for personal use, pled guilty to one count of interstate transportation of stolen property and one count of wire fraud, and was sentenced to thirty months in federal prison); Lett, 674 N.W.2d 139, 140-143 (revoking license of an attorney who gambled away $13,300 stolen from a client, stole $5000 from another client for her own burial expenses, and consequently pled guilty to second-degree theft); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Vinyard, 656 N.W.2d 127, 128-29, 131-32 (Iowa 2003) (revoking the law license of an attorney who was convicted of several counts of mail fraud and money laundering over a fraudulent scheme where the attorney and his brother overcharged the brother’s employer and kept the money for themselves); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga, 619 N.W.2d 327, 328 (Iowa 2000) (revoking the license of an attorney who had fourteen convictions for theft, prostitution, trespass, forgery, and deceptive practices, when much of the underlying conduct involving the writing of bad or unauthorized checks and shoplifting); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Schatz, 595 N.W.2d 794, 795-96 (Iowa 1999) (revoking the license of an attorney who pled guilty to theft and income tax evasion after converting over $140,000 in legal fees after a period of many years); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Palmer, 563 N.W.2d 634, 634-35 (Iowa 1997) (revoking the license of an attorney who pled guilty to a felony after stealing two credit cards and using them to obtain funds for his own purposes).
Yet when the criminal conviction involves fraudulent conduct without theft or conversion, lesser sanctions have at times been imposed. For example, in Romeo, we suspended an attorney’s license for three years after the attorney falsified receipts to protect a client who was under criminal suspicion. 554 N.W.2d at 553-55. The attorney had only been convicted of a misdemeanor, but we accepted the jury’s finding that “Romeo knowingly engaged in false and deceitful conduct.” Id. at 554. Additionally, Romeo did not “reach this court with a sterling record,” because he had a previous public reprimand for sending a letter that threatened criminal charges solely to obtain an advantage in a *525 civil matter, and a prior conviction for simple misdemeanor theft. Id.
A closer analogy to the present case may be found in the Gallner disciplinary proceeding. 621 N.W.2d at 183. In Gallner, we suspended an attorney for six months for overstating the attorney fees he had charged his clients for handling workers’ compensation cases in letters to the Social Security Administration. 621 N.W.2d at 185. “By reporting exaggerated attorney fees to the Social Security Administration, [the attorney] enabled some of his clients to receive more social security disability benefits than they would have been entitled to under the law.” Id. In settling on a six-month suspension, we noted that the attorney had a prior disciplinary record. Id. at 188. Gallner is instructive here because it involved an attorney who made affirmative written misrepresentations in the course of a representation that enabled a party to receive more funds than the party was entitled to. However, unlike in the case at hand, the attorney in Gallner was not convicted of a crime.[8]
There is also some similarity between Bieber’s misconduct and a criminal conviction for failing to file tax returns. The latter cases, we have said, involve “ ‘cheating] the government.’ ” Iowa Supreme Ct. Att’y Disciplinary Bd. v. Knopf, 793 N.W.2d 525, 531 (Iowa 2011) (quoting Iowa Supreme Ct. Att’y Disciplinary Bd. v. Iversen, 723 N.W.2d 806, 810 (Iowa 2006)). In Knopf, we reviewed the varying levels of discipline meted out by this court when attorneys failed to file tax returns. Id. We have “imposed a sanction of license suspension from sixty days to three years” in such cases. Id. For example, in Knopf we suspended the attorney for three months after he had been convicted of two counts of fraudulent practices for failing to file state income tax returns. Id. at 528-31. We acknowledged that illness can be a mitigating factor and noted the parties’ stipulation to additional mitigating factors including lack of a disciplinary history, cooperation with the Board, and the winding down of the attorney’s practice. Id. at 531-32.
In Scholl, we imposed a six-month suspension. 814 N.W.2d at 215. In addition to his conviction on three counts of third-degree fraudulent practice for failure to file tax returns, the attorney substantially underreported his income for several years after his failure to file the returns was discovered. Id. at 212. We determined the attorney violated rule 32:8.4(c) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. Id. at 213-14.
In Fields, a tax evasion case in which we imposed an eighteen-month suspension, the attorney was also found to have engaged in a variety of other serious misconduct including neglect of two client matters. 790 N.W.2d at 793.
In Iowa Supreme Court Board of Professional Ethics & Conduct v. Neuwoehner, we imposed a ninety-day suspension upon an attorney who had been convicted of third-degree fraudulent practices for failure to file state income tax returns, while noting that “a lawyer’s failure to file income tax returns misrepresents that law *526 yer’s income.” 595 N.W.2d 797, 798 (Iowa 1999).[9]
Admittedly, a difference between this case and the failure to file income tax return cases is that the deceptive acts in this case were committed in the course of the attorney’s representation of a client. On the other hand, when an attorney fails to report income to the government, he or she is deriving a direct personal benefit from the fraud, a circumstance not present here.
In Committee on Professional Ethics & Conduct v. Littlefield, we revoked the license of an attorney who had been convicted in Kentucky of attempting to commit a felony by making a false statement to procure a credit card. 244 N.W.2d 824, 825-26 (Iowa 1976). While that case did not involve a completed theft, the fraud was for the attorney’s personal benefit. Id. at 825. Moreover, we emphasized that the attorney had “determined to evade the restrictions of his probation and willfully disobeyed the order” of the Kentucky court that he not practice law during his probation by removing himself to Iowa and resuming the practice of law. Id. at 825-26. As to the latter conduct, we concluded:
His dishonest and deceitful conduct in these regards demonstrates his lack of the requisite good moral character required of an individual before he is permitted to engage in the practice of law in this state, and his actions permit of no other sanction than the immediate and permanent revocation of his license to practice the profession of law in Iowa.
Id. at 826. Thus, the revocation in Little-field appears to have been based in large part on the attorney’s willful evasion of the terms of his court-imposed probation. Notably, we cited Littlefield with approval in a subsequent case where we imposed a ninety-day suspension on an attorney who had engaged in fraudulent conduct but was unable to complete his intended conversion of funds. See Comm. on Prof'l Ethics & Conduct v. Millen, 357 N.W.2d 313, 314-15 (Iowa 1984). In that case, the attorney had been ordered during his pending divorce proceeding not to withdraw any funds from a specific account without the written approval of his wife. Id. at 314. In violation of that order, the attorney had drafted checks worth over $26,000 payable to himself and forged his wife’s signature to those checks. Id. He was unsuccessful only because the wife’s attorney learned of the checks and contacted the payor institution in time. Id.
Courts in other jurisdictions have considered the appropriate sanction for an attorney convicted of misprision of a felony and reached varying conclusions, depending on the situation. See Att’y Grievance Comm’n of Md. v. Wingerter, 400 Md. 214, 929 A.2d 47, 57-58, 60 (2007) (disbarring attorney who pled guilty to misprision of a felony after acknowledging that he was aware of the existence of a conspiracy to engage in immigration fraud and affirmatively acted to conceal such activity); In re Calonge, 52 A.D.3d 1111, 859 N.Y.S.2d 536, 536-37 (2008) (suspending lawyer for two years subsequent to conviction of misprision of a felony for “mailing] a letter to the United States Citizenship and Immigration Services for the purpose of con *527 cealing a fraudulent certification of employment”); State ex rel. Okla. Bar Ass’n v. Golden, 201 P.3d 862, 863-64, 866 (Okla. 2008) (disbarring attorney whose involvement in health care fraud cover-up led to conviction of misprision of a felony for which he was sentenced to three years probation and ordered to pay $5,719,340.22 in restitution).
In In re Russell, a New York appellate court considered the case of an attorney who pled guilty to misprision of a felony and was sentenced
to a term of probation of one year, confined to his home with electronic monitoring for a period of six months, ordered to pay a fine in the sum of $25,000 and a special assessment in the sum of $100, directed to perform 20 hours per week of community service while on probation, and ordered to participate in a mental health treatment program.
63 A.D.3d 71, 877 N.Y.S.2d 364, 365 (2009). The court held that a six-month suspension was an appropriate sanction in light of the attorney’s lack of a disciplinary record in New York, acknowledgement of his misconduct, expression of remorse, cooperation with the grievance committee, “strict adherence to the terms of his suspension and federal probation, his meticulous record keeping, and the fact that he ha[d] been automatically reinstated in the State of Connecticut upon the expiration of his federal probation.” Id.
In an Arizona case, an attorney pled guilty to misprision of a felony after being named as a defendant in a federal indictment alleging conspiracy to defraud the United States in relation to a former client’s tax evasion scheme. In re Morris, 164 Ariz. 391, 793 P.2d 544, 545 (1990). The Supreme Court of Arizona suspended the attorney for six months pursuant to an Arizona disciplinary rule that required the suspension of any attorney convicted of a felony. Id. at 546-47. The mitigating factors in that case were that the attorney had been a member of the bar for over twenty years, he had no prior disciplinary record, and there was no evidence of a “dishonest or selfish motive or desire for pecuniary gain.” Id. at 547.
In State ex rel. Counsel for Discipline v. Boose, the Supreme Court of Nebraska held that disbarment was the appropriate sanction for an attorney in a reciprocal disciplinary proceeding. 277 Neb. 1, 759 N.W.2d 110, 113 (2009). The attorney failed to report that his client, a county commissioner, was engaging in illegal self-dealing in a public real estate transaction. Id. at 112. The attorney had pled guilty to misprision of a felony and had been suspended for three years by the Florida Supreme Court. Id. at 112-13.
We agree with the commission that Bieber’s lack of a prior disciplinary record is an important mitigating factor. See Iowa Supreme Ct. Att’y Disciplinary Bd. v. Lustgraaf, 792 N.W.2d 295, 301-02 (Iowa 2010) (noting the lack of a prior record of discipline as a mitigating factor); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Howe, 706 N.W.2d 360, 379 (Iowa 2005) (same). An additional mitigating factor is Bieber’s record of community service. See Schall, 814 N.W.2d at 215 (recognizing voluntary community service as a mitigating factor); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Boles, 808 N.W.2d 431, 442 (Iowa 2012) (same). Also, Bieber acknowledged wrongdoing and expressed remorse for his actions. He has paid the entire restitution. Iowa Supreme Ct. Att’y Disciplinary Bd. v. Taylor, 814 N.W.2d 259, 268 (Iowa 2012) (finding that taking responsibility for one’s actions is a mitigating factor); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Tofflemire, 689 N.W.2d 83, 93 (Iowa 2004) (“A mitigating factor is the attorney’s recognition of some wrong *528 doing.”)- -And Bieber has cooperated fully with the Board and the commission. Iowa Supreme Ct. Att’y Disciplinary Bd. v. Denton, 814 N.W.2d 548, 551 (Iowa 2012) (noting cooperation as a mitigating circumstance). A further mitigating factor is that Bieber is well respected in his legal community, as several character witnesses attested. See Iowa Supreme Ct. Att’y Disciplinary Bd. v. Iversen, 723 N.W.2d 806, 811 (Iowa 2006) (noting that “we do not overlook an attorney’s devoted service to the profession” (quoting Iowa Supreme Ct. Bd. of Prof'l Ethics and Conduct v. Frerichs, 671 N.W.2d 470, 478 (Iowa 2008))). Lastly, we are persuaded that Bieber’s misconduct was not motivated by a desire for financial gain. See Howe, 706 N.W.2d at 380 (noting as a mitigating factor that the attorney did not intend to obtain any personal financial benefit). Bieber only stood to receive the standard $400 fee he charged for any real estate closing.[10]
Yet the fact remains that Bieber was involved in a criminal fraud as part of his law practice, albeit one that did not involve — as far as he knew — a theft or conversion of funds. Although Bieber has demonstrated that he and his client operated under a reasonable belief that Han-neken and Herdrich were going to use the additional loan proceeds to improve the property, rather than abscond with them, Bieber correctly acknowledges that “if somebody hadn’t done the part of it that I did, they wouldn’t have been able to pull it off.” This serious violation of our ethical standards warrants a significant sanction.
V. Disposition.
In light of all of the facts and circumstances in this case, and after careful consideration of the goals of our ethical rules, mitigating and aggravating factors, our precedents, and cases from other jurisdictions, we suspend Bieber’s license to practice law in this state indefinitely with no possibility of reinstatement for six months. This suspension applies to all facets of the practice of law. See Iowa Ct. R. 35.12(3). Bieber must comply with Iowa Court Rule 35.22 dealing with the notification of clients and counsel.
Upon application for reinstatement, Bie-ber must establish that he has not practiced law during the suspension period and that he has complied with the requirements of Iowa Court Rules 35.13 and 35.22. The costs of this action are taxed to Bieber pursuant to Iowa Court Rule 35.26(1).
LICENSE SUSPENDED.
All justices concur except WATERMAN and ZAGER, JJ., who concur specially, and WIGGINS, J., who dissents.

. Recent amendments to the Iowa Court Rules are not applicable in this case because the hearing was held prior to their effective date. See Iowa Ct. R. 35.26 (2012).

.
The elements of Misprision of Felony are 1) the principal committed and completed the alleged felony; 2) defendant had full knowledge of that fact; 3) defendant failed to notify the authorities; and 4) defendant took steps to conceal the crime.
United States v. Cefalu, 85 F.3d 964, 969 (2d Cir.1996). Bieber had previously gone to trial on a number of federal charges. The case ended in a mistrial because the jury could not reach verdicts on those charges.

. Rule 32:4.1 prohibits "makflng] a false statement of material fact or law to a third person” or "failflng] to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.” See Iowa R. of Prof’l Conduct 32:4.1(a)-(b). As noted above, Bie-ber denied the inflated sales price was material given the real estate lending environment as it existed in 2005.

. We presume that this amount is what the lender ultimately lost after foreclosing on the property. Other participants in the transaction who were criminally convicted were also ordered to make the same restitution, but it was paid entirely by Bieber.

. It is entirely possible that the lender did not care much about the borrowers' ability to repay the loan from their personal assets, but would have wanted to be able to recoup the loan amount by foreclosing on the property if necessary.

. Iowa Code section 602.10122 states in relevant part:
The following are sufficient causes for revocation or suspension:
1. When the attorney has been convicted of a felony. The record of conviction is conclusive evidence....

. We question to some extent the Board's reliance on these aggravating factors. Bie-ber's attorney acknowledged that Bieber had been involved in four or five transactions where money went back to Hanneken and Herdrich. However, only one transaction was charged by the Board, and evidence was presented only as to that transaction. Also, it is true that Bieber's attorney (not Bieber) said at one point Bieber “did not think it was a scheme and thought this was just fine, and it wasn’t.” Yet this off-the-cuff remark needs to be placed in the context of the entire hearing. Bieber consistently took responsibility for his conduct and admitted it was fraudulent. His attorney made the foregoing statement as a way of emphasizing that Bieber understood at the time that the $55,000 kickback was going into building repairs rather than being kept by Hanneken and Herdrich. The evidence that Bieber had that belief was unrebutted. Overall, we think Bieber’s attorney mounted a vigorous but proper defense of his client at the commission hearing.

. It should be noted, though, that Bieber understood the excess funds provided by the lender would be spent on repairs to improve the property in which the lender had a security interest. In Gallner, by contrast, the federal government was being induced into making oveipayments with no benefit in return. See also Comm. on Prof'l Ethics & Conduct v. Bauerle, 460 N.W.2d 452, 454 (Iowa 1990) (imposing a six-month suspension on an attorney who backdated various documents and performed a false notarization to enable a client to obtain financial gain).

. In Vinyard, we said, "Where felony convictions have directly involved dishonest conduct, we have revoked the attorney's license to practice law." 656 N.W.2d at 132. That is a true statement. Yet as the foregoing summary indicates, we have not automatically revoked the license of an attorney who is convicted of conduct involving fraud. An important consideration, as we discuss above, is whether the fraud included a theft or conversion of funds.

. The Board did not treat Bieber's recent illness as a mitigating factor. We follow the same approach. While we certainly sympathize with Bieber’s present medical situation, for mitigation purposes we generally focus on whether the attorney was suffering from a health condition when the misconduct occurred. See Schall, 814 N.W.2d at 215.