IN THE SUPREME COURT OF IOWA
No. 23–0099

Submitted September 13, 2023—Filed December 8, 2023

IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,

Appellee,

vs.

DAVID L. LEITNER,

Appellant.

On appeal from the report of the Iowa Supreme Court Grievance Commission.

In an attorney disciplinary action, the grievance commission recommends revocation of an attorney's license for violations of ethical rules. **LICENSE SUSPENDED.**

May, J., delivered the opinion of the court, in which all justices joined.

David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellant.

Tara van Brederode and Alexis W. Grove, Des Moines, for appellee.

**MAY, Justice.**

David Leitner has held a license to practice law in Iowa since 1979. In 2022, the Iowa Supreme Court Attorney Disciplinary Board (Board) filed a five-count complaint against Leitner. The complaint charged Leitner with numerous violations of the Iowa Rules of Professional Conduct. Leitner did not file an answer. Because Leitner did not answer, the Iowa Supreme Court Grievance Commission (commission) deemed the allegations of the complaint to be admitted. Based on those admissions and some additional evidence presented at a hearing, the commission concluded that Leitner had violated several rules. As a sanction for those violations, the commission recommends that we should revoke Leitner's license.

We have carefully reviewed the commission's recommendation and the record as a whole. Following our review, we conclude that the Board proved that Leitner violated numerous rules. In light of those violations, as well as the aggravating and mitigating factors shown in the record, we conclude that the proper sanction is a suspension of Leitner's license for two years. This suspension will commence ten days from the date of this opinion. Iowa Ct. R. 34.23(1).

**I. Our Review.**

We review de novo the record made before the commission. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Johnson*, 988 N.W.2d 399, 406 (Iowa 2023). Through that review, we must determine whether the Board has proven each "alleged violation[] . . . by a convincing preponderance of the evidence." *Id.* (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Aeilts*, 974 N.W.2d 119, 125 (Iowa 2022)). We make this determination even where—as here—the responding attorney has essentially admitted the Board's allegations through the attorney's failure to

answer. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. O'Brien*, 971 N.W.2d 584, 589 (Iowa 2022).

With that said, because Leitner did not answer the complaint, "we deem the *factual* allegations . . . in . . . the complaint admitted" for purposes of our review. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Moonen*, 706 N.W.2d 391, 396 (Iowa 2005) (emphasis added). In light of those admissions, we find the facts alleged in the complaint are established by a convincing preponderance of the evidence. But we do not necessarily adopt legal conclusions stated in the complaint.

## II. Merits.

### A. Mitchell and Foodprairie (Count I).

1. *Background.* In count I of the complaint, the Board alleges that Leitner violated two of our rules through his involvement with a client named Marvin Mitchell and an entity known as Foodprairie, L.L.C. Specifically, the Board claims that Leitner violated rules 32:1.2(d), which prohibits lawyers from "counsel[ing] a client to engage, or assist[ing] a client, in conduct that the lawyer knows is criminal or fraudulent," and 32:8.4(c), which prohibits lawyers from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa Rs. of Prof'l Conduct 32:1.2(d), 32:8.4(c). As support for these charges, the Board alleges in its complaint the following facts, which we deem to be admitted:

> 3. Leitner has long served as the attorney for an individual named Marvin Mitchell, representing him in various matters since at least 2004.

> 4. Mitchell has been involved in the farming industry for several decades. Mitchell's business has involved the sale and distribution of seed.

> 5. In or around 2007, Mitchell was indicted for bankruptcy fraud in federal court and was subsequently sentenced to 18 months in prison. Mitchell pled guilty to concealing assets by creating various business entities and then transferring funds, land,

equipment, and other assets to those entities prior to declaring bankruptcy.

6. Mitchell owes substantial sums of money to the federal government and, as a consequence, any income he receives is potentially subject to garnishment by federal authorities. Mitchell owes approximately $71,000.00 to the United States Department of Agriculture and also has several federal tax liens against his home.

7. On or about March 27, 2013, Leitner filed a certificate of organization with the Iowa Secretary of State creating a limited liability company known as Foodprairie, L.L.C. ("Foodpra[i]rie").

8. In subsequent biennial reports filed by Leitner, he describes himself as the "managing member" of Foodprairie.

9. Foodprairie was created by Leitner as part of a deliberate scheme to hide Mitchell's funds from creditors, including the federal government.

10. On or about November 28, 2016, Leitner opened a bank account for Foodprairie at Central Bank in Iowa. In the account agreement Leitner signed when opening the account, he described Foodprairie as a "single-member LLC." Leitner further certified that he was the "manager or designated member" of Foodprairie.

11. Upon information and belief, Mitchell has continued to work in the farming industry since his criminal conviction and has received income from that work. At least part of that income has been concealed using the Foodprairie business entity and bank account established by Leitner.

12. Mitchell's work in the farming industry since his conviction has included the sale of seed. In or around March of 2017, Mitchell entered into a contract to become a dealer of Pfister Seed[s] ("Pfister") products. Eric Schweinefus, a Pfister employee at that time, knew Mitchell from previous business dealings and approached Mitchell about becoming a Pfister dealer.

13. Mitchell told Schweinefus that he wanted to become a Pfister dealer but said that he did not want his own name associated with the Pfister dealership. Mitchell told Schweinefus that his lawyer, Leitner, could help establish the Pfister dealership without using Mitchell's name.

14. Schweinefus provided Mitchell with a copy of Pfister's standard dealership agreement.

15. The dealership agreement was later signed by Leitner. The completed dealership form listed Foodprairie as the dealer and Leitner as Foodprairie's "sole member." Mitchell's name does not appear on the form. The completed dealership agreement form was subsequently sent to Jim Riefenrath, an Assistant General Manager for Pfister.

16. Upon receiving the dealership agreement, Riefenrath was initially confused, as he had previously been told by Schwein[e]fus that the dealership agreement would be between Pfister and Mitchell.

17. Riefenrath subsequently participated in a telephone conference call with both Mitchell and Leitner. During the call[,] Leitner indicated that Foodprairie was his company. Leitner and Mitchell both agreed that Mitchell's dealership agreement with Pfister should be in Foodprairie's name.

18. After executing the dealership agreement, Mitchell began selling Pfister products and earning commissions and fees for his sales.

19. Some or all of the funds owed to Mitchell under the terms of the dealership agreement were wired to the Foodprairie account at Central Bank.

20. While working as a dealer of Pfister products, Mitchell earned substantial sums of money from Pfister, but the funds were always cloaked in the Foodprairie name.

21. Creating Foodprairie, opening a bank account in its name, and entering into the contract with Pfister under the name of Foodprairie were all an artifice developed with Leitner's assistance to provide Mitchell with a means of receiving funds without detection by creditors, including the federal government.

22. Leitner allowed Mitchell to use an LLC that Leitner created—Foodprairie—to help Mitchell conceal income from his creditors, including the federal government.

23. Leitner opened a bank account in Foodprairie's name and allowed Mitchell to use the account to receive money surreptitiously.

24. Leitner facilitated the contract between Mitchell and Pfister and executed the dealership agreement with Pfister in the name of Foodprairie so that Mitchell could do business without detection or garnishment of funds earned.

(Footnote omitted.)[1]

2. *Analysis.*

a. *Rule 32:8.4(c): conduct involving dishonesty.* With these facts in mind, we now consider the Board's allegation that Leitner's involvement with Mitchell and Foodprairie violated rule 32:8.4(c). Rule 32:8.4(c) states: "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . . ." Iowa R. of Prof'l Conduct 32:8.4(c). "To find a violation of rule 32:8.4(c), we must find that the attorney acted with 'some level of scienter' rather than mere negligence." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Green*, 888 N.W.2d 398, 403 (Iowa 2016) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Haskovec*, 869 N.W.2d 554, 560 (Iowa 2015)). We have found violations when an attorney has acted with a purpose to deceive. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. McCuskey*, 814 N.W.2d 250, 255 (Iowa 2012); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 531 (Iowa 2011). But even "[a]n attorney's 'casual, reckless disregard for the truth' " can be sufficient to show a violation. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Heggen*, 981 N.W.2d 701, 708 (Iowa 2022) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Muhammad*, 935 N.W.2d 24, 38 (Iowa 2019)).

Viewing the record as a whole and considering the admitted allegations in the complaint, we conclude that Mitchell and Leitner used Foodprairie in an attempt to deceive Mitchell's creditors. Although Mitchell was dealing seed for Pfister and receiving money for that work, Mitchell and Leitner tried to create a false impression that only Leitner—and not Mitchell—was involved with Pfister. This conduct violated rule 32:8.4(c).

---

[1]Footnote 1 to the complaint adds: "Pfister Seed[s] subsequently merged with NuTech Seed, which is a subsidiary of Corteva, Inc."

b. *Rule 32:1.2(d): involvement with client in fraud.* We next consider the Board's allegation that Leitner's involvement with Mitchell and Foodprairie violated rule 32:1.2(d). Rule 32:1.2(d) states in pertinent part that "[a] lawyer shall not . . . assist a client, in conduct that the lawyer knows is . . . fraudulent." Iowa R. of Prof'l Conduct 32:1.2(d). As explained, though, we have already found that Leitner's conduct with Mitchell violated rule 32:8.4(c), our general rule against "conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.* r. 32:8.4(c). So we need not determine whether the same conduct also violated rule 32:1.2(d), which deals with similar concepts.

3. *Conclusions as to count I.* As to count I, we conclude Leitner violated rule 32:8.4(c) by assisting Mitchell's efforts to mislead his creditors.

**B. Fries and Barney (Count II).**

1. *Background.* We now turn to count II of the complaint. There, the Board charges Leitner with violating three of our rules through his representation of Brooks Barney in a dissolution case. Specifically, the Board claims Leitner violated rule 32:3.3(a)(1), which prohibits false statements to tribunals; rule 32:8.4(c), which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation"; and rule 32:8.4(d), which prohibits "conduct . . . prejudicial to the administration of justice." *Id.* rs. 32:3.3(a)(1), 32:8.4(c)–(d). As support for these charges, the Board alleges in its complaint the following facts, which we deem to be admitted:

> 26. On April 14, 2020, Leitner filed an appearance on behalf of Brooks Barney in Polk County District Court Case No. DRCV060024—a dissolution-of-marriage . . . action filed by Barney's then-spouse, Deena Fries.

> 27. Leitner had previously represented Barney in a criminal case in which Barney was charged with assaulting Fries (*State v. Barney*, Polk County District Court Case No. FECR336891).

28. The parties participated in a successful mediation regarding the dissolution of marriage action and signed a mediated agreement on July 21, 2020.

29. Based upon the mediation agreement, Fries's counsel, Elizabeth Kellner-Nelson, prepared a stipulation comprised of the agreed-upon terms and emailed it, in a PDF format, to Leitner on August 3, 2020.

30. Leitner returned what appeared to be the same PDF, signed by himself and Barney, to Kellner-Nelson by email on or about August 21, 2020.

31. Unbeknownst to Kellner-Nelson, Leitner had modified the PDF document containing the stipulation, adding a significant provision regarding custody of the parties' minor child.

32. Paragraph 3 of the original PDF Kellner-Nelson sent to Leitner states:

> Visitation. Unless otherwise agreed, Brooks will be entitled to time with B.S.B. every other weekend from Saturday at 4:00 p.m. until Sunday at 7:00 p.m. and every Tuesday from 6:00 p.m. until Wednesday at 7:00 a.m.

33. Leitner modified the PDF to state:

> Visitation. Unless otherwise agreed, Brooks will be entitled to time with B.S.B. every other weekend from Saturday at 4:00 p.m. until Sunday at 7:00 p.m. and every Tuesday from 6:00 p.m. until Wednesday at 7:00 a.m. *Respondent sha [sic] first right of refusal to have B.S.B. whenever Petitioner is otherwise unable to care for him.*

(Emphasis added).

34. At no point did Leitner notify Kellner-Nelson that he had modified the PDF document to add the "right-of-first-refusal provision."

35. The right-of-first-refusal provision was also not part of the parties' mediation agreement. Moreover, neither the parties nor their respective counsel had ever previously discussed a right-of-first-refusal provision. Rather, Leitner unilaterally inserted the provision without notifying or consulting with Kellner-Nelson.

36. Because the stipulation had been sent and returned as a PDF document, and because Leitner did not notify her of the modification to paragraph 3, Kellner-Nelson reasonably believed the PDF document Leitner returned to her was the same as the one she had sent to him, changed only to add the signature of his client.

37. Kellner-Nelson had reviewed the stipulation with Fries before sending it to Leitner. After Leitner returned the stipulation that he surreptitiously modified, Fries signed it, reasonably believing it to be the stipulation she had previously reviewed with her attorney.

38. The stipulation was filed with the district court on August 25, 2020.

39. In January of 2021, Barney—who at the time was subject to both a criminal and a civil no-contact order in which Fries was the protected party—notified Fries of his right of first refusal based upon the modified stipulation.

40. On January 25, 2021, Kellner-Nelson filed a motion to vacate the order approving the parties' stipulation.

41. On March 29, 2021, Leitner filed an application to initiate contempt proceedings based in part on the allegation that Fries had failed to honor the right-of-first-refusal provision Leitner had furtively added to the stipulation.

42. On June 29, 2021, a hearing was held on Fries's motion to vacate the stipulation agreement and Barney's application to initiate contempt proceedings.

43. Following the hearing, the district court entered an order granting Fries's motion to vacate the order approving the stipulation. The court found Leitner and his client engaged in fraud when modifying the stipulation to include the right-of-first-refusal provision.

44. The court found that Leitner and his client intentionally deceived Fries and Kellner-Nelson. The court found "an intent to deceive based on the manner in which the provision was inserted and returned without any suggestion that a revision had been made."

45. The court further noted that Fries was damaged by the fraudulent insertion of the right-of-first-refusal provision. The court explained:

Fries is currently protected by a five-year criminal No Contact Order after Barney plead[ed] guilty to domestic abuse assault by impeding breathing without injury. Barney's interpretation of the right of first refusal would require Fries to alert him anytime she decided to leave the minor child in someone else's care (such as at home with her older children), even if it was only for an hour to go to the gym or the grocery store. Essentially Fries would have to disclose far greater information about her daily life to someone against whom she is protected by a No Contact Order.

The testimony in this case demonstrates the problematic nature of Barney's claims. Barney called two different witnesses to report that Fries had been seen at a bar on a weekend night and a Prairie Meadows on New Year's Eve. He messaged Fries while she was at the grocery store to ask where the child was if he wasn't with her. Clearly, Barney is keeping tabs on Fries'[s] whereabouts, despite the existence of a No Contact Order.

(Footnote omitted).

46. The court also denied Barney's application to initiate contempt proceedings.

47. Leitner's covert modification of the stipulation was not Leitner's only dishonest act while representing Barney.

48. On December 2, 2020, Kellner-Nelson filed an application to initiate contempt proceedings based on Barney's failure to pay either child support or his required $200 monthly car payment to Fries.

49. In response, [Leitner] filed a motion to dismiss the contempt application in which he falsely stated that Barney had "brought his child support current," Barney had paid the $200 monthly car payment, and the contempt application was "frivolous."

50. On January 14, 2021, the district court entered an order holding Barney in contempt. The court found that Barney had willfully failed to pay child support and the car payment.

51. On February 25, 2021, Kellner-Nelson filed a motion to waive a mediation that had been ordered in response to her application to vacate the parties' stipulation. On March 3, 2021, Leitner filed a resistance to the motion in which he falsely claimed

that he had "tried, without success, to get opposing counsel to set up the mediation or at least provide alternative dates." Leitner had made no effort to contact Kellner-Nelson about mediation.

52. A hearing was scheduled for July 8, 2021, to determine if Barney had complied with the contempt order. Neither Leitner nor Barney appeared for the hearing. The presiding judge contacted Leitner by phone to inquire why he and his client had not appeared for the hearing. Leitner stated that he believed the hearing was by phone and that he had told his client he did not need to participate in the hearing. The hearing was rescheduled for July 19, 2021.

53. At the July 19 hearing, Barney testified that Leitner had not notified him of the July 8 compliance hearing, and he was not told of any hearing until July 16.

(First alteration in original.)

2. *Analysis.*

a. *Rule 32:3.3(a)(1): false statements to tribunals.* We now consider whether Leitner violated rule 32:3.3(a)(1) through his misrepresentations to the district court in the Fries and Barney dissolution case. Rule 32:3.3(a)(1) states, "A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ." Iowa R. of Prof'l Conduct 32:3.3(a)(1). The requirement of a "statement" can be met through oral or written statements. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 953 N.W.2d 156, 163 (Iowa 2021). The "knowingly" requirement means actual knowledge. *Id.* at 163–64. Actual knowledge can be inferred from circumstances. *Id.* But we don't infer that "an attorney made a misrepresentation knowingly simply because the misrepresentation occurred." *Id.* at 164 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 486 (Iowa 2014)).

Applying these principles here, we conclude that Leitner violated rule 32:3.3(a)(1) on two occasions during the Fries and Barney dissolution case. First, Leitner violated 32:3.3(a)(1) through a written filing in which Leitner falsely

represented that he had tried to set up mediation. Leitner would have known that this representation was false because it involved Leitner's own behavior, namely, his own failure to try to set up mediation. So we infer that this misrepresentation was made knowingly and, therefore, in violation of rule 32:3.3(a)(1).

Second, and likewise, Leitner violated rule 32:3.3(a)(1) by falsely representing to the court that Leitner had notified his client of a hearing. Again, this misrepresentation was about a matter within Leitner's personal knowledge. This conduct violated rule 32:3.3(a)(1).

b. *Rule 32:8.4(c): conduct involving dishonesty.* We now consider whether Leitner violated rule 32:8.4(c). As previously discussed, rule 32:8.4(c) prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. of Prof'l Conduct 32:8.4(c). From a strictly *factual* perspective, Leitner ran afoul of rule 32:8.4(c) through the misconduct just discussed, that is, his false representations to the court. But "[w]hen we find conduct violates a specific provision" of our rules that "involv[es] dishonesty, fraud, deceit, or misrepresentation, we will not find the same conduct violates rule 32:8.4(c)." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barnhill,* 885 N.W.2d 408, 422 (Iowa 2016) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Netti,* 797 N.W.2d 591, 605 (Iowa 2011)). That is the case here: we have already found that Leitner's misrepresentations to the court violated rule 32:3.3(a)(1). So we do not find that these misrepresentations also violate rule 32:8.4(c).

This does not, however, end our discussion of rule 32:8.4(c). Count II also describes additional dishonest conduct by Leitner, namely, Leitner's fraudulent insertion of the right-of-first-refusal provision in a dissolution decree. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Kallsen,* 814 N.W.2d 233, 238 (Iowa 2012) (finding "dishonesty" which separately "goes beyond [a] specific rule violation"

can still violate rule 32:8.4(c)). We have no doubt that this behavior was designed to mislead—and did mislead—both Fries and Fries's counsel. This conduct violated rule 32:8.4(c).

c. *Rule 32:8.4(d): conduct prejudicial to the administration of justice.* We now consider whether Leitner violated rule 32:8.4(d), which states, "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice . . . ." Iowa R. of Prof'l Conduct 32:8.4(d). "An attorney's conduct is prejudicial to the administration of justice when it violates the 'well-understood norms and conventions of the practice of law' " and thus "hampers 'the efficient and proper operation of the courts or of ancillary systems upon which the courts rely.' " *Aeilts*, 974 N.W.2d at 128 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 180 (Iowa 2013)). "We have consistently held an attorney violates rule 32:8.4(d) when the 'misconduct results in additional court proceedings or causes court proceedings to be delayed or dismissed.' " *Johnson*, 988 N.W.2d at 413 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noel*, 933 N.W.2d 190, 204 (Iowa 2019)).

Here we conclude that Leitner's behavior violated rule 32:8.4(d) in two ways. First, Leitner's fraudulent insertion of the right-of-first-refusal provision was a radical violation of the "well-understood norms and conventions of the practice of law." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Mbanza*, 996 N.W.2d 711, 721 (Iowa 2023) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Palmer*, 825 N.W.2d 322, 325 (Iowa 2013)). This fraudulent conduct required additional court proceedings to vacate the tainted stipulation. This conduct violated rule 32:8.4(d).

Second, Leitner doubled down on his initial fraud by bringing a contempt action to enforce the fraudulently added right-of-first-refusal provision. Through this contempt action, Leitner again disregarded the "well-understood norms and

conventions of the practice of law." *Id.* at 721 (quoting *Palmer*, 825 N.W.2d at 325). And, again, Leitner's actions required additional court proceedings to dispose of the contempt action. This conduct violated rule 32:8.4(d).

3. *Conclusions as to count II.* As to count II, we find Leitner violated rule 32:3.3(a)(1) twice by lying to the court about two different topics. We also find Leitner violated rule 32:8.4(c) through his fraudulent insertion of the right-of-first-refusal provision. And we find that Leitner violated rule 32:8.4(d) twice by fraudulently inserting the right-of-first-refusal provision and then filing a contempt action to enforce the fraudulent provision.

**C. Jamison and Lu-Jen (Count III).**

1. *Background.* We now turn to count III of the complaint, in which the Board charges Leitner with violating three of our conflict-of-interest rules through his representation of clients with adverse interests. Specifically, count III charges violations of rules 32:1.7(a)(2), 32:1.9(a), and 32:1.9(c). As support for these charges, the Board alleges in its complaint the following facts, which we deem to be admitted:

55. On April 16, 2020, Leitner filed an answer on behalf of Lu-Jen Farms, Inc. and Cliff Bowie ("Lu-Jen") in Cedar County District Court Case No. LACV036444.

56. The suit was initiated by the James D. Jamison Irrevocable Trust ("Jamison") against Lu-Jen and alleged breach of contract, among other claims. The petition alleged the parties entered into a contract in which Lu-Jen agreed to purchase all of its corn and soybean crop from Jamison, but Lu-Jen had failed to make payment to Jamison as required by the contract.

57. Leitner previously represented Jamison; Leitner drafted the contract in question on behalf of Jamison.

58. Although he himself drafted the contract, in the answer he filed on behalf of Lu-Jen, [Leitner] stated, "the alleged contract is unconscionable and void as against public policy."

59. [Leitner] also stated in the answer that Jamison, his former client, "is not and was not at the time claimed a licensed dealer of agricultural seed."

60. On April 23, 2020, Jamison's counsel, Daniel Rockhold, sent Leitner a letter asking Leitner to withdraw from representing Lu-Jen because of the conflict of interest. Rockhold also notified Leitner that he would likely be a witness in the case, as Leitner had firsthand knowledge regarding the formation and execution of the contract.

61. Leitner replied to Rockhold by letter dated April 30, 2020. In the letter, Leitner acknowledged the conflict of interest, stating, "[U]pon further reflection, I do agree that I may have a conflict of interest." Leitner indicated that he would be withdrawing because of the conflict of interest.

62. Leitner did not withdraw his representation of Lu-Jen.

63. On July 15, 2020, Rockhold filed a motion to disqualify Leitner, as Leitner had not voluntarily withdrawn. On August 3, 2020, the district court entered an order disqualifying Leitner.

64. Following Leitner's disqualification, Jamison filed an amended petition on September 28, 2020. On October 20, 2020, Jamison served Lu-Jen with notice of intent to file an application for default judgment, as Lu-Jen had not filed an answer to the amended petition.

65. On October 29, 2020, Leitner filed an answer to the amended petition on behalf of Lu-Jen. The answer was signed by Cliff Bowie, a representative of and co-defendant with Lu-Jen. However, the answer was filed by Leitner through his electronic document management system account.

(Alteration in original) (footnote omitted.)[2]

2. *Analysis.*

a. *Rule 32:1.9(a): conflict with former client.* We now consider the Board's allegation that Leitner violated rule 32:1.9(a) through his representation of Lu-Jen and Jamison. Rule 32:1.9(a) states, "A lawyer who has formerly represented

---

[2]Footnote 2 to the complaint adds: "Leitner drafted the contract for Jamison and Sons, a predecessor entity to the Jamison Irrevocable Trust."

a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." Iowa R. of Prof'l Conduct 32:1.9(a). So where (as here) there is no client consent, this rule is violated when three conditions are met: (1) there are consecutive representations of two or more different clients, (2) the representations involve "the same or a substantially related matter," and (3) the new client's interests are "materially adverse" to those of the former client. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Marks*, 814 N.W.2d 532, 539 (Iowa 2012) (quoting Iowa R. of Prof'l Conduct 32:1.9(a)).

We believe all three conditions are met through Leitner's involvement with Jamison and Lu-Jen. First, the consecutive-representation condition is met because Leitner represented Jamison and then represented Lu-Jen. Second, these consecutive representations both involved "the same or a substantially related matter" because (1) Leitner's representation of Jamison involved drafting a contract between Jamison and Lu-Jen, and (2) Leitner's representation of Lu-Jen involved litigation against Jamison over the very contract that Leitner had drafted for Jamison. Iowa R. of Prof'l Conduct 32:1.9(a). Third, and finally, Lu-Jen's interests were "materially adverse" to Jamison's interests because Jamison was suing Lu-Jen. *Id.* And so Leitner's representation of Lu-Jen violated rule 32:1.9(a).

This conclusion draws added support from the comments to rule 32:1.9. Comment [1] states, in part, "Under this rule, for example, a lawyer could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client." *Id.* r. 32:1.9 cmt. [1]. This is exactly what Leitner did. First, Leitner drafted the contract for Jamison. And then, when Leitner represented Lu-Jen, Leitner filed a pleading in which Leitner claimed that the very contract

Leitner had drafted was both "unconscionable" and "void as against public policy." This conduct violated rule 32:1.9(a).

b. *Rule 32:1.7(a): concurrent conflict.* Next we consider the Board's allegation that Leitner violated rule 32:1.7(a)(2) through his representation of a new client, Lu-Jen, against a former client, Jamison. Rule 32:1.7(a)(2) prohibits lawyers from "represent[ing] a client if the representation involves a concurrent conflict of interest." *Id.* r. 32:1.7(a). For purposes of 32:1.7(a)(2), "[a] concurrent conflict of interest exists if: . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." *Id.* r. 32:1.7(a)(2). An attorney's representation is materially limited when the attorney's " 'ability to consider, recommend, or carry out an appropriate course of action' is restricted due to the attorney's 'other responsibilities or interests.' " *State v. Mulatillo,* 907 N.W.2d 511, 519 (Iowa 2018) (quoting Iowa R. of Prof'l Conduct 32:1.7 cmt. [8]).

We conclude that Leitner violated rule 32:1.7(a)(2) by representing Lu-Jen. As just explained, because Leitner drafted the contract on behalf of Jamison, Leitner was ethically prohibited from trying to rescind the same contract on behalf of Lu-Jen. In other words, Leitner's preexisting duties to Jamison prohibited Leitner from pursuing an appropriate defense strategy on behalf of Lu-Jen. In the words of rule 32:1.7(a)(2), Leitner's duties to his "former client," Jamison, "materially limited" Leitner's representation of Lu-Jen. Iowa R. of Prof'l Conduct 32:1.7(a)(2). This conduct violated rule 32:1.7(a)(2).

c. *Rule 32:1.9(c): using information related to former representation.* Next we consider whether Leitner violated rule 32:1.9(c) by improperly using information about his former client Jamison during Leitner's representation of Lu-Jen. Rule 32:1.9(c) places limits on when attorneys can "use" or "reveal"

information "relating to the representation" of former clients. *Id.* r. 32:1.9(c). Rule 32:1.9(c)(1) generally prohibits attorneys from using that "information . . . to the disadvantage of the former client." *Id.* r. 32:1.9(c)(1). But there are exceptions. *See id.* The prohibition does not apply "when the information has become generally known" or when the rules otherwise "would permit or require [use of the information] with respect to a client." *Id.*

Applying rule 32:1.9(c) here, we do not conclude that the Board has shown a violation. The complaint does not specify what representation-related information Leitner used to Jamison's disadvantage. Nor does the complaint explain whether that (unspecified) information was fair game because it was "generally known" or because other rules "permit[ted] or require[d]" Leitner to use it. *Id.* Nor do we find these details elsewhere in the record. So we are unable to conclude that the Board established a violation of rule 32:1.9(c) "by a convincing preponderance of the evidence." *Johnson*, 988 N.W.2d at 406 (quoting *Aeilts*, 974 N.W.2d at 125).

3. *Conclusions as to count III.* As to count III, we conclude Leitner violated rules 32:1.7(a) and 32:1.9(a).

**D. Elizabeth and Timothy John (Count IV).**

1. *Background.* We now turn to count IV of the complaint, in which the Board charges Leitner with violating three rules in connection with his representation of Elizabeth John and her son, Timothy. Specifically, count IV charges Leitner with violating rule 32:1.7(a), which prohibits certain conflicts of interest; rule 32:3.1, which prohibits certain frivolous filings; and rule 32:8.4(d), which prohibits conduct "prejudicial to the administration of justice." Iowa Rs. of Prof'l Conduct 32:1.7, 32:3.1, 32:8.4. As support for these charges, the Board alleges in its complaint the following facts, which we deem admitted:

67. On April 2, 2019, Leitner filed an appearance on behalf of Elizabeth John ("Elizabeth") in Polk County District Court Case Nos. TRPR074630 and TRPR074636. The cases were initiated by Elizabeth's daughter, Kimberly Milliken, and related to two trusts for which Elizabeth was the designated trustee.

68. The petitions filed by Milliken alleged Elizabeth had been deemed by a medical professional incapable of making financial decisions and sought to have Elizabeth replaced as trustee.

69. After the cases were initiated, Elizabeth met with her longtime attorney, Richard Howes, and informed him she wanted him to represent her in the trust cases. Howes contacted Leitner and informed him that he would be taking over representation of Elizabeth. On July 11, 2019, Howes filed an appearance in the trust cases on behalf of Elizabeth.

70. On July 12, 2019, Leitner filed a withdrawal of his appearance on behalf of Elizabeth.

71. On August 1, 2019, Milliken and Elizabeth filed a joint stipulation. In the stipulation, Milliken and Elizabeth agreed that an amendment to the two trusts at issue should be revoked. The amendment had been prepared by Leitner on or around March 28, 2019. The stipulation was signed by Elizabeth, Howes, and Milliken's counsel.

72. The March 28 amendment made several changes to the trusts, including eliminating or significantly reducing Milliken's interests in two properties, and granted those properties to Elizabeth's son, Timothy John ("Timothy").

73. Although he had withdrawn from the trust cases, Leitner filed an objection on behalf of Timothy to the stipulation on August 2, 2019.

74. In the objection, Leitner stated:

> The undersigned [Leitner] can attest to the fact that that amendment was executed by Betsey John at a time when she was fully competent and had total testamentary capacity as defined in Iowa law. She insisted that that amendment be drafted, and it was. She signed of her own free will fully understanding its terms and its import.

75. On August 8, 2019, the court entered an order approving Milliken and Elizabeth's stipulation and revoking the March 28 amendment to the trusts.

76. On October 15, 2019, Milliken filed a petition to appoint a guardian and conservator in which Elizabeth was the proposed protected person. The petition was based on the same grounds as the trust cases and alleged that Elizabeth's decision-making capacity was significantly impaired.

77. On October 16, the court entered an order appointing Richard Howes as counsel for Elizabeth. The order also appointed Kim Walker of Transitional Life Consulting, LLC as Guardian ad Litem for Elizabeth and Milliken as temporary guardian.

78. Following the court's October 16 order, Timothy brought Elizabeth to meet with Leitner at Leitner's office to discuss the pending cases. Leitner did not notify Howes, Walker, or Milliken of the meeting.

79. Howes later learned of the meeting and thus contacted Leitner to inform him that he did not have permission to communicate with Howes's client Elizabeth.

80. On October 23, 2019, Howes sent the following email to Leitner:

> David,
>
> You may know that Kim has been appointed as Bets[e]y's temporary guardian. If not, I am, as a courtesy, attaching a copy of the order and affidavit of mailing.
>
> As Bets[e]y is my client at this time as stated in the court order[,] you do not have permission to communicate with her either alone or with anyone else.
>
> Please respect that request.
>
> Richard.

81. On October 24, 2019, Howes sent the following email to Leitner:

David,

I understand Tim may be planning to bring Bets[e]y to meet with you. I am requesting again you do not meet with her or otherwise communicate with her as she is my client[,] per court order[,] and is under a guardianship and conservatorship and does not have the ability to make decisions for herself at this time.

Please take notice and govern yourself accordingly.

Richard[.]

82. Despite Howes's emails, Leitner met with Elizabeth at his office. Thereafter, Howes received a typewritten letter dated October 24, 2019, purportedly signed by Elizabeth, stating that she wished to terminate Howes as her attorney and retain Leitner.

83. On October 29, 2019, Howes sent the following email to Leitner:

David,

I am following up [on] my previous emails to you regarding your contact with my client, Elizabeth John. Subsequent to my last email to you, I received in the mail a typewritten note purportedly signed by my client advising me that she is discharging me and engaging your services. To the extent you had contact with her and had any part in this communication[,] you have violated my admonition to not contact her and have crossed an ethical line.

Elizabeth is under a court[-]ordered guardianship and conservatorship and at this time does not have the ability to engage or discharge attorneys on her own. That matter would have to be done under the auspices of the court.

Again[,] I am admonishing you not to have contact with my client, Elizabeth John. As her court[-]appointed attorney[,] I am obligated to so advise you and warn you that further contact will not only again cross an ethical line but potentially violate a court order.

Richard[.]

84. On October 29, 2019, Milliken, through counsel, filed a motion to disqualify Leitner from the guardianship case. The motion also sought an order preventing Timothy from having further contact with Elizabeth.

85. The motion alleged Timothy, aided by Leitner, unduly influenced Elizabeth and interfered with her well[-]being and assets. The motion further alleged that Leitner's attempts to represent Elizabeth created a conflict of interest due to his previous joint representation of Timothy and Elizabeth. The motion also noted that Leitner had met with Elizabeth while she was represented by Howes.

86. On November 20, 2019, the district court entered an order prohibiting Leitner from having any further contact with Elizabeth without express permission from Howes.

87. On March 6, 2020, Leitner filed a new petition in the Polk County District Court on behalf of Elizabeth and Timothy. The petition purported to be signed by Elizabeth.

88. The petition named Milliken and Howes as defendants, among others. Leitner did not have permission from the court or Howes to communicate with Elizabeth about the petition or to file the petition on her behalf.

89. The petition was not well-grounded in law or fact. Leitner alleged the defendants had violated Elizabeth and Timothy's constitutional rights and sought damages pursuant to 42 U.S.C[.] §§ 1983 and 1985. The petition also sought to have the guardianship and conservatorship invalidated.

90. The defendants moved to dismiss Leitner's petition; on April 16, 2020, the district court dismissed the petition. The court also sanctioned Leitner for filing the petition. In the order sanctioning Leitner, the court noted that Leitner had been prohibited from having any contact with Elizabeth but nevertheless filed the petition on her behalf. The court further found that Leitner's petition amounted to a collateral attack on the probate and guardianship cases.

(First and ninth alterations in original.)

2. *Analysis.* We now consider whether these facts establish the violations alleged by the Board in count IV. As a preliminary matter, we note that during the proceedings before the commission, the Board withdrew its allegation that

Leitner's conduct violated rule 32:1.7(a), which prohibits certain conflicts of interest. So we do not consider that issue further. We also note that the commission did not find a violation of rule 32:3.1, which prohibits certain frivolous filings, and the Board has not asked us to consider that issue further. So we turn instead to the Board's allegation that Leitner violated rule 32:8.4(d).

As explained, rule 32:8.4(d) prohibits "conduct that is prejudicial to the administration of justice." Iowa R. of Prof'l Conduct 32:8.4(d). This rule is "violate[d] . . . when the 'misconduct results in additional court proceedings or causes court proceedings to be delayed or dismissed.'" *Johnson*, 988 N.W.2d at 413 (quoting *Noel*, 933 N.W.2d at 204).

We conclude that Leitner violated rule 32:8.4(d) in at least two ways. First, Leitner's repeated contact with a represented party led to a motion to prohibit further contact and, ultimately, an order granting that motion. Then Leitner violated that order by contacting the represented party and filing a petition on her behalf. This required additional court action to dismiss the petition and sanction Leitner for his violation of the prior order. This conduct violated rule 32:8.4(d).

3. *Conclusions as to count IV.* As to count IV, we find that Leitner violated rule 32:8.4(d) twice.

**E. CSA Audit (Count V).**

1. *Background.* In count V of the complaint, the Board charges Leitner with violating several rules governing lawyers' handling of client funds. The Board also charges Leitner with violating rule 32:8.4(c), the general rule that prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. of Prof'l Conduct 32:8.4(c). As support for these charges, the Board alleges in its complaint the following facts, which we deem admitted:

92. In July of 2020, the Iowa Supreme Court Client Security Commission ("CSC") initiated an audit of Leitner's client trust account ("CTA"). The audit revealed Leitner failed to comply with chapter 45 of the Iowa Rules of Court when handling money entrusted to him by clients.

93. The audit revealed Leitner had negative sub-account balances in his CTA totaling $5,153.16.

94. Leitner did not perform timely monthly triple reconciliations.

95. In his 2020 Combined Statements and Questionnaire [(CSQ)], Leitner answered "yes" to the following question: "Are reconciliations of your trust account balances with bank statement balances and individual client ledger balances performed monthly?"

96. Leitner knowingly provided a false answer to that question.

97. The audit further revealed that Leitner received $1000.00 from a client on May 22, 2020, as an advanced payment of fees but failed to deposit those funds in his CTA.

98. The audit also showed that Leitner failed to provide clients contemporaneous written notice of withdrawals from his client trust account, nor did he provide clients an accounting of the funds he held from them in his trust account.

99. The audit also revealed client trust ledger activity that was not reflected in the CTA records, meaning there were expenses paid with respect to a client from the operating account instead of from the CTA.

2. *Analysis and conclusion.* We conclude Leitner violated rule 32:8.4(c), which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation," by knowingly providing a false answer on his 2020 CSQ. Iowa R. of Prof'l Conduct 32:8.4(c). Leitner also violated all of these trust fund rules: rule 32.1.15(a) (requiring attorneys to keep others' property separate from their own property), rule 32:1.15(c) (requiring attorneys to deposit advance fees into a CTA), rule 45.1 (mandating "identifiable interest-bearing trust accounts"

for third-party funds), rule 45.2(3)(*a*)(9) (establishing requirements for proper record keeping for CTAs), rule 45.7(3) (forbidding attorneys from withdrawing advance payments from a CTA before they are earned), and rule 45.7(4) (requiring attorneys to notify clients about withdrawals and balances). Iowa Rs. of Prof'l Conduct 32:1.15(a), 32:1.15(c); Iowa Ct. Rs. 45.1, 45.2(3)(*a*)(9), 45.7(3), 45.7(4).

### III. Sanctions.

Because we have found that Leitner violated several of our rules, we now address the question of sanctions. Our harshest sanction—revocation—has been recommended by the commission. "We give the commission's recommendation respectful consideration, but may impose a greater or lesser sanction." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Ranniger*, 981 N.W.2d 9, 18 (Iowa 2022) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Morse*, 887 N.W.2d 131, 143 (Iowa 2016)). Sanctions should reflect our goals of protecting "society from those unfit to practice law, . . . uphold[ing] public confidence in the justice system," deterring future misconduct, and "maintain[ing] . . . the reputation of the bar as a whole." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008) (per curiam). When deciding what sanction is appropriate in a particular case, we put special emphasis on "the nature, number, and seriousness of the [attorney's] violations." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Barry*, 908 N.W.2d 217, 233 (Iowa 2018) (quoting *Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Hansel*, 558 N.W.2d 186, 192 (Iowa 1997)). We also consider our history of sanctioning similar misconduct, any special mitigating factors that apply to the particular case, and any special aggravating factors. *See, e.g., Iowa Sup. Ct. Att'y Disciplinary Bd. v. Noyes*, 936 N.W.2d 440, 448–50 (Iowa 2019).

**A. Leitner's Violations.** We start by reviewing Leitner's misconduct. As explained, Leitner has committed numerous violations, some of which are extremely serious. In brief summary:

- Leitner violated rule 32:8.4(c) by assisting a client's effort to mislead the client's creditors.

- Leitner violated rule 32:3.3(a)(1) by lying to the district court about two different topics.

- Leitner violated rules 32:8.4(c) and 32:8.4(d) by fraudulently inserting a right-of-first-refusal provision in a dissolution decree.

- Leitner violated rule 32:8.4(d) by filing a contempt action to enforce the fraudulently inserted right-of-first-refusal provision.

- Leitner violated rule 32:8.4(d) by repeatedly contacting a represented party.

- Leitner violated rule 32:8.4(d) by violating a court order that required Leitner to refrain from contacting a represented party.

- Leitner violated rules 32:1.7(a) and 32:1.9(a) by drafting a contract for a client and then switching sides to litigate against his prior client in a suit about the very contract that Leitner drafted.

- Leitner violated rule 32:8.4(c) by knowingly providing a false answer on his 2020 CSQ.

- Leitner also violated several other trust fund rules.

**B. Historical Sanctions.** Now we consider the kinds of sanctions we have given to attorneys whose misconduct is comparable to Leitner's. Attorneys who engage in dishonesty in violation of rule 32:8.4(c) have received "sanctions ranging from reprimand to license revocation." *Aeilts*, 974 N.W.2d at 129 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 338 (Iowa 2015)). Attorneys who actively disregard their obligation of candor toward

the tribunal have received "substantial sanctions ranging from permanent disbarment to six-month license suspensions." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Kieffer-Garrison*, 951 N.W.2d 29, 38 (Iowa 2020) (quoting *Kallsen*, 814 N.W.2d at 239). Attorneys who engage in conduct prejudicial to the administration of justice have received suspensions ranging from sixty days to eighteen months when, as here, the conduct is "compounded by additional violations." *Aeilts*, 974 N.W.2d at 129 (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Turner*, 918 N.W.2d 130, 153 (Iowa 2018)). Attorneys who violate our conflict-of-interest rules have received sanctions ranging from a public reprimand to revocation. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Willey*, 889 N.W.2d 647, 657 (Iowa 2017); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Powell*, 901 N.W.2d 513, 516 (Iowa 2017). "Sanctions for trust account and accounting violations span from 'a public reprimand when the attorney, in an isolated instance, failed to deposit funds into his trust account because he believed the fees to be earned' to 'suspensions of several months where the violations were compounded by severe neglect, misrepresentation, or failure to cooperate.' " *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Cross*, 861 N.W.2d 211, 225 (Iowa 2015) (quoting *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 442 (Iowa 2012)).

**C. Potential Mitigating Factors.** We next consider whether the record shows any mitigating factors. Specifically, we consider whether mitigation should be found because of (1) Leitner's pro bono work, (2) Leitner's service to an underserved community, (3) Leitner's poor health, or (4) Leitner's limited disciplinary history.

1. *Pro bono work.* Mitigation has been found when an attorney performs pro bono and reduced-fee work. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Johnson*, 884 N.W.2d 772, 781 (Iowa 2016). We find that Leitner has performed some of this work. This is mitigating.

2. *Underserved community.* Mitigation has also been found when an attorney "provides legal services to an underserved community." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Said*, 869 N.W.2d 185, 194 (Iowa 2015). Leitner has accepted appointments for indigent criminal defendants, an underserved community. This is mitigating.

3. *Poor health.* Mitigation is sometimes found when an attorney struggles with physical and mental health issues. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 881 (Iowa 2012). Like the commission, though, we see no causal relationship between Leitner's poor health and his failure to comply with the rules. So we do not consider his health issues to be mitigating.

4. *Disciplinary history.* Mitigation is often found when an attorney has no prior disciplinary history. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Bieber*, 824 N.W.2d 514, 527–28 (Iowa 2012). Leitner's lack of prior discipline is mitigating.

**D. Potential Aggravating Factors.** We next consider whether the record shows aggravating factors. Specifically, we consider whether Leitner's misconduct is aggravated by (1) his substantial experience, (2) his failure to take responsibility, or (3) his behavior in the grievance process.

1. *Substantial experience.* Aggravation is often found when an offending lawyer has substantial experience. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Jacobsma*, 920 N.W.2d 813, 819 (Iowa 2018) ("Jacobsma's twenty years of experience are substantial[,] and we view them as an aggravating factor."). Leitner has been in practice since 1979. His extensive experience is an aggravating factor.

Leitner claims his experience should be viewed as mitigating because his career has been distinguished. We find no basis in the record to characterize Leitner's career in this way. For instance, this is not a case in which the record contains supportive letters from judges or lawyers.

2. *Failure to take responsibility.* Aggravation is also found when attorneys "minimiz[e] or fail[] to take responsibility for [their] misconduct." *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 17 (Iowa 2012). This applies to Leitner. At the disciplinary hearing, "Leitner categorically denied the charges that were alleged against him." In his appellate brief, Leitner repeated this denial. Although Leitner has acknowledged the trust account issues discovered in the audit, he has steadfastly denied his most serious violations. He takes no responsibility for his worst behavior. This is aggravating.

3. *Failure to cooperate in the process.* Aggravation is also found when attorneys fail to cooperate with the disciplinary process. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rickabaugh*, 728 N.W.2d 375, 381 (Iowa 2007) (finding failure to cooperate "is an independent act of misconduct"). But Leitner claims his cooperation has been so exemplary that we should view it as mitigating. We take the opposite view. Leitner failed to cooperate in two significant ways. First, although rule 36.7 required Leitner to answer the Board's complaint, Leitner never did. Iowa Ct. R. 36.7. This is aggravating. *See Rickabaugh*, 728 N.W.2d at 380–81 (finding failure to answer board's complaint violated rules DR 1–102(A)(5) and DR 1–102(A)(6), predecessors to the current rules).

Second, Leitner tried to mislead the commission about an alleged settlement with the Board. During the hearing before the commission, Leitner submitted emails and testimony suggesting that he had reached an agreement with the Board for a particular term of suspension. But then the Board presented an email from Leitner. That email showed that, in fact, Leitner had not accepted the offer. Instead, the email showed, Leitner had rejected the offer and made a counteroffer. Even so, Leitner testified that he actually accepted the Board's offer. The commission did not find that testimony credible. On our de novo

review, we agree. We conclude Leitner tried to mislead the commission. This is seriously aggravating.

**E. The Proper Sanction Here.** We now consider the proper sanction for Leitner. We have said that "[w]hat should dictate the sanction . . . is the nature, number, and seriousness of the [attorney's] violations." *Barry,* 908 N.W.2d at 233 (first alteration in original) (quoting *Hansel,* 558 N.W.2d at 192). When considering Leitner's violations, we bear in mind that "[f]undamental honesty is the [baseline] and mandatory requirement to serve in the legal profession." *Johnson,* 988 N.W.2d at 418 (quoting *Barry,* 908 N.W.2d at 233). And Leitner has repeatedly breached his duty of honesty by assisting his client's efforts to mislead creditors, making false statements to the court, defrauding opposing counsel in a dissolution matter, knowingly providing a false answer on his CSQ, and trying to mislead the commission. This "pattern of deceit" raises an inference that Leitner is "unfit to practice law." *Rickabaugh,* 728 N.W.2d at 382. This inference is made much stronger by Leitner's failure to acknowledge—much less repent from—his pattern of deceit.

At the same time, we acknowledge that there are some mitigating factors here. The most important mitigating factor is Leitner's lack of prior disciplinary history. Even so, given "the nature, number, and seriousness of" Leitner's violations, we think a two-year suspension is appropriate. *Barry,* 908 N.W.2d at 233 (quoting *Hansel,* 558 N.W.2d at 192). "This will serve to deter similar conduct and preserve the integrity of the profession in the eyes of the public." *Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Honken,* 688 N.W.2d 812, 820–22 (Iowa 2004) (imposing a two-year suspension against an attorney who engaged in serious ethical breaches—including multiple acts of misrepresentation— across multiple matters but who did not have a prior disciplinary history).

We have considered the Board's argument that Leitner's involvement with Mitchell and Foodprairie justifies revocation. As support, the Board relies on *Iowa Supreme Court Attorney Disciplinary Board v. Engelmann*, 840 N.W.2d 156 (Iowa 2013), and *Iowa Supreme Court Attorney Disciplinary Board v. Nelsen*, 807 N.W.2d 259 (Iowa 2011). In those cases, we found that revocation was justified by an attorney's involvement with a client's fraudulent scheme. *Engelmann*, 840 N.W.2d at 166–67; *Nelsen*, 807 N.W.2d at 267–68. But we believe both cases are distinguishable. In *Engelmann*, the record showed that an attorney assisted in fraudulent transactions that resulted in "losses of $392,937.73" for certain lenders. *Engelmann*, 840 N.W.2d at 157–58. In *Nelsen*, the record showed that an attorney had assisted clients to convert "at least $141,335.34 . . . from . . . [a] court-appointed receiver" who was legally entitled to the funds. *Nelsen*, 807 N.W.2d at 261. But the record here does not show any comparable harm. For starters, the record does not show that the federal government or any other creditor had any lien or other possessory interest in Mitchell's receivables. So, as the Board concedes, neither Leitner nor Mitchell converted any funds from anyone. Moreover, the record does not show that the federal government or any other creditor was actually trying to collect Mitchell's receivables. And so the record does not show that the federal government or any other creditor was actually deceived or otherwise hampered in its efforts to collect. At most, the record shows that Mitchell and Leitner hoped to deceive any creditors who *might* try to collect from Mitchell. This *theoretical* effect is substantially different from the *actual* harm documented in *Nelsen* and *Engelmann*.

## IV. Conclusion.

We hereby suspend Leitner's license to practice law in Iowa indefinitely, with no possibility of reinstatement for two years. This suspension will commence ten days from the date of this opinion. Iowa Ct. R. 34.23(1). This

suspension applies to all facets of the practice of law. *Id.* r. 34.23(3). We further direct Leitner to comply with the requirements set forth in Iowa Court Rule 34.24 and assess the costs of the instant disciplinary action to him, Iowa Ct. R. 36.24(1).

**LICENSE SUSPENDED.**